UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL JAMES LATHROP,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,<br><br>Defendant. | 4:18-CV-04025-VLD<br><br><br>MEMORANDUM OPINION AND ORDER |

**INTRODUCTION**

Plaintiff, Michael James Lathrop, seeks judicial review of the

Commissioner's final decision denying his application for social security

disability and supplemental security income disability benefits under Title II

and Title XVI of the Social Security Act.[1]

--------

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference–greatly simplified-is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Mr. Lathrop filed his application for both types of benefits. AR10.  His coverage status for SSD benefits expires on December 31, 2019. Id.  In other words, in order to be

Mr. Lathrop has filed a complaint and has requested the court to reverse the Commissioner's final decision denying him disability benefits and to enter an order awarding benefits. Alternatively, Mr. Lathrop requests the court remand the matter to the Social Security Administration for further proceedings.

This appeal of the Commissioner's final decision denying benefits is properly before the district court pursuant to 42 U.S.C. § 405(g). This matter is before this magistrate judge pursuant to the consent of the parties. See 28 U.S.C. § 636(c).

## FACTS[2]

**A.    Statement of the Case**

This action arises from plaintiff, Michael James Lathrop's, ("Mr. Lathrop"), application for SSDI filed on December 8, 2014, and his application for SSI filed on June 20, 2016, alleging disability since August 20, 2014, due to pain in the upper middle back, headaches, problems breathing, and back and neck problems. AR67, 185, 189, 218, 222, 269 (citations to the appeal record will be cited by "AR" followed by the page or pages).

---

entitled to Title II benefits, Mr. Lathrop must prove disability on or before that date.

[2] These facts are gleaned from the parties' submitted stipulated facts (Docket 13). The court has made only minor grammatical and stylistic changes.

Mr. Lathrop's SSDI claim was denied initially and upon reconsideration, although the initial denial notice does not appear in the appeal record. AR89.[3] Mr. Lathrop's SSI claim was not denied at either the initial or reconsideration level because it was not filed until after requesting a hearing. AR189. Mr. Lathrop requested an administrative hearing. AR105.

Mr. Lathrop's administrative law judge hearing was held on March 27, 2017, by Richard Hlaudy, ("ALJ"). AR32. Mr. Lathrop was represented by other counsel at the hearing, and an unfavorable decision was issued on June 26, 2017. AR7, 32.

At Step One[4] of the evaluation, the ALJ found that Mr. Lathrop had not engaged in substantial gainful activity, ("SGA"), since the date of his alleged onset of disability, August 20, 2014, and that he met the insured status for his SSDI claim through December 31, 2019. AR12.

At Step Two, the ALJ found that Mr. Lathrop had a severe impairment of cervical spine degeneration, status post C6-7 anterior cervical discectomy and fusion. AR12-13.

The ALJ also found that Mr. Lathrop had a medically determinable impairment of obesity based on a diagnosis in the record, but found it

---

[3] The parties stipulated that the initial denial notice does not appear in the record, but it appears to the court that AR89 is the initial denial notice, dated February 19, 2015.

[4] A detailed description of the five-step sequential analysis can be found in part B of the DISCUSSION section of this opinion.

nonsevere because the ALJ did not see a recommendation in the record for weight loss or other discussion of Mr. Lathrop's obesity as it might relate to his complaints. AR13.

The ALJ also found that Mr. Lathrop had a medically determinable impairment of minimal degenerative lumbar spondylosis as demonstrated in lumbar spine x-rays, but the ALJ stated it was clinically mild and found it nonsevere. AR13.

The ALJ found that Mr. Lathrop had a medically determinable impairment of femoral acetabular impingement, but found it nonsevere because the ALJ concluded physical examinations had not been indicative of hip abnormality. AR13.

The ALJ found that Mr. Lathrop had a medically determinable impairment of degenerative thoracic spondylosis and degenerative changes, but found it nonsevere because the ALJ concluded physical examinations had not indicated during the examination abnormalities indicative of significant thoracic spine dysfunction, multiple physicians had noted the thoracic findings were not significant and did not support Mr. Lathrop's complaints of pain, and nerve conduction studies of the thoracic paraspinal muscles were negative. AR13.

The ALJ also stated Mr. Lathrop complained of difficulty breathing, but concluded "a review of the record reflects no respiratory or pulmonary impairments." AR13. The ALJ then stated he had "considered this complaint as it relates to his spinal abnormalities, however." AR13.

As Step 3, the ALJ found Mr. Lathrop did not have an impairment that met or medically equaled one of the listed impairments in 20 CFR 404, Subpart P, App 1. (hereinafter referred to as the "Listings"). AR13.

In evaluating whether Mr. Lathrop met or medically equaled a Listing the only Listing specifically discussed in the decision was Listing 1.04, and the ALJ concluded Mr. Lathrop did not demonstrate such findings as neuro-anatomic distribution of pain or motor loss as indicated by the Listing. AR13.

The ALJ determined Mr. Lathrop had the residual functional capacity, ("RFC"), to perform:

> less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is able to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently. He is limited to standing and/or walking for 6 hours in an 8-hour workday, and he can sit for 6 hours in an 8-hour workday. The claimant is able to push and pull on a frequent basis with the bilateral upper extremities. The claimant is limited to frequently stooping, kneeling, crouching, crawling, and climbing ramps and stairs. He is able to occasionally climb ladders, ropes, and scaffolds.

AR14.

The ALJ found Mr. Lathrop's statements concerning the intensity, persistence and limiting effects of his symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." AR15.

The ALJ considered the opinions of the state agency medical consultants who limited Mr. Lathrop to a range of light work with only occasional reaching, pushing, and pulling, and gave them "only some weight" because the ALJ concluded "such significant upper extremity restrictions are not consistent

5

with the objective evidence of the record, which generally reflects that the claimant's upper extremity strength is normal." AR18. The ALJ also noted records that reflected somewhat limited shoulder range of motion, or painful shoulder range of motion, but concluded that it was sporadic and not so significant as to limit Mr. Lathrop to occasional upper extremity use. AR18.

The ALJ considered the opinions of the functional capacity evaluation performed by physical therapist, Craig Riley, in July, 2015, and gave the opinion "little weight" because the ALJ concluded Mr. Riley was not an acceptable medical source, multiple medical doctors had "noted that there is a lack of objective evidence to support such limitations," and the ALJ found some of the restrictions were extreme and not consistent with "modest treatment" received by Mr. Lathrop. AR18.

The ALJ considered the independent medical examination performed by Dr. O'Neil and concluded Dr. O'Neil "did not provide a clear functional assessment" but did indicate that use of a cane was unnecessary, and to the extent this was an opinion it is given some weight AR18-19.

The ALJ considered the independent medical examination performed by Dr. Janssen and stated that Dr. Janssen "more or less endorsed the conclusions of Mr. Riley's functional capacity evaluation" but gave Dr. Janssen's opinions "little weight" because the ALJ asserted Dr. Janssen failed to address the upper extremity limitations, even though Dr. Janssen's examination noted intact upper extremity range of motion and strength. AR19.

The ALJ considered a Physician Statement from Dr. Adams dated December 23, 2014, and gave it little weight because it was vague and did not set specific limitations. AR19.

The ALJ considered an affidavit from Mr. Lathrop's daughter that explained Mr. Lathrop engaged in limited daily activities and appeared to be in significant pain. Id. The ALJ stated it "generally accepted" the observations of Mr. Lathrop's daughter. AR19.

The ALJ considered the depositions of Dr. Peterson and Dr. Adams, but asserted they were "generally cursory, vague, and were geared more toward causation than cumulative impact on work" and gave them no weight. AR19.

The ALJ stated it considered "workers compensation information" that indicated Mr. Lathrop was unable to work and gave it no weight. The exhibits cited by the ALJ, however, are not workers compensation information. Rather, they are South Dakota Department of Labor determinations that Mr. Lathrop is not entitled to unemployment compensation because he had been found unable to work. AR19, 184, 212, 213.

Based on the RFC determined by the ALJ, the ALJ found Mr. Lathrop was not capable of performing any past relevant work. AR20.

At Step 5, relying on the testimony of a vocational expert, the ALJ denied Mr. Lathrop's claim. The ALJ found there was other work Mr. Lathrop could perform including hand packager, DOT# 559.687.074, labeler, DOT# 920.587-014, and inserter, DOT# 794.687-058. AR21.

Mr. Lathrop timely requested review by the Appeals Council. AR181. The Appeals Council denied Mr. Lathrop's request for review making the ALJ's decision the final decision of the Commissioner. AR1. Thereafter, Mr. Lathrop timely filed this action.

## B. Plaintiff's Age, Education and Work Experience

Mr. Lathrop was born in 1974 and completed high school in 1993, and a tool and dye training class in 1993. AR185, 219.

The ALJ did not identify Mr. Lathrop's past relevant work in the decision, but did note Mr. Lathrop had an "excellent" work history indicative of a positive work ethic, supporting the notion that Mr. Lathrop would have returned to his past work if he were able. AR18, 20. The vocational expert listed jobs of press-brake operator and packaging. AR349.

## C. Relevant Medical Evidence

### 1. Yankton Medical Clinic:

Mr. Lathrop was seen on August 9, 2013, to follow-up from a motor vehicle accident, which occurred July 3, 2013. AR494, 498. Mr. Lathrop reported daily moderate symptoms, aggravated by lifting and relieved by medication and physical therapy. AR498. He reported he was still having quite a bit of pain in his back and neck, muscle weakness, and days with physical therapy were worse. AR498-99. His medications included Flexeril, ibuprofen, and Tylenol-Codeine. AR498. Examination revealed he was in a level of distress and in pain, with cervical spine tenderness and moderately

reduced range of motion. AR500. Mr. Lathrop's assessment was cervicalgia and physical therapy and medications were continued. AR501.

Mr. Lathrop was seen on September 5, 2013, and reported ongoing symptoms including pain in his shoulder blades and mid back and limited range of motion in shoulders with left worse. AR494. Mr. Lathrop described the pain as "steady, dull pain to back and shoulder blades are a dull pain until I move then its [sic] sharp." AR494. He reported that physical therapy and medications were helping to relieve his neck pain, which was described as resolved. AR494. Examination revealed thoracic spine tenderness, left shoulder tenderness, and reduced range of motion with positive Apley's test. AR496. The record indicated Mr. Lathrop had a history of prior injury to his left shoulder in 2010. AR497. X-rays obtained revealed mild left AC degenerative joint disease. AR516.

Mr. Lathrop was seen on September 12, 2013, and reported ongoing bilateral shoulder pain and reduced range of motion, and mid back pain following a "pop" during therapy four weeks earlier. AR490. An MRI taken following the accident revealed a C6-7 disc herniation, and a new MRI was ordered due to suspected C7 radiculopathy to his left upper extremity. AR492.

Mr. Lathrop was seen on September 19, 2013, for a preoperative exam prior to anterior cervical discectomy and fusion surgery scheduled with Dr. Adams. AR484. Mr. Lathrop reported weight gain due to decreased activity secondary to his neck injury. AR484. He also reported numbness in his

extremities, and neck pain. AR484. Exam revealed the cervical spine tender with moderate pain with motion. AR486. He was cleared for surgery. AR488.

Mr. Lathrop had a C6-7 anterior cervical discectomy and fusion performed by Dr. Adams on September 27, 2013. AR517.

Mr. Lathrop saw Dr. Adams for follow up after surgery on October 15, 2013, and reported some pain between his shoulder blades and was wearing a c-collar. AR478. His exam was normal except a positive Axial compression test. AR479.

Mr. Lathrop was seen again on November 19, 2013, with similar findings and was released to return to work. AR476-77. He was seen again on December 31, 2013, and denied neck pain or tingling in his arms, but reported getting more migraines. AR474-75. He was back at work and described as doing quite well. AR475.

Mr. Lathrop was seen again by Dr. Adams on February 18, 2014, and reported recurrent pain between his shoulder blades beginning a month earlier with it getting worse beginning February 12, 2014, up to a 10 and was doing some heavy lifting at work, which made it worse. AR471-72. Dr. Adams stated Mr. Lathrop needed to back off the amount of lifting he was doing, and gave him a slip describing different work limitations. AR472.

Mr. Lathrop was seen on March 25, 2014, and was continuing to have shoulder pain bilaterally, worse with any work or heavy work. AR468-69. An anti-inflammatory was recommended and Mobic prescribed. AR469-70.

Mr. Lathrop was seen on May 28, 2014, and reported ongoing pain between his shoulders that "gets so bad it is hard to breathe." AR465. Mr. Lathrop reported that the Mobic helped but he still had pain at the end of the day, and the Mobic dosage was adjusted. AR466. When Mr. Lathrop was seen on July 1, 2014, he still had some pain between his shoulders, but was described as doing quite well. AR463.

Mr. Lathrop was seen on September 25, 2014, with continued pain between his shoulder blades. AR460. His Mobic had "somehow" been stopped so it was resumed. AR460. X-rays obtained revealed that the cranial aspect of his neck fusion may have a pseudoarthrosis posteriorly, but Dr. Adams stated, "I don't think he would do very well with a posterior operation. That is the only way we can solve this problem for him at this point. He is going through a disability claim right now and we will continue to work with him on this." AR460.

Dr. Adams completed a Physician's Statement on December 23, 2014, in which he stated Mr. Lathrop was diagnosed with cervicalgia with neck pain, and was permanently restricted to "light duty work." AR521.

Mr. Lathrop was seen by Dr. Judith Peterson on March 24, 2015, by referral from Dr. Adams for back pain in his upper back, middle back, and neck. AR530. He described the pain as an ache and sharp and it was aggravated by lifting, running, sitting, standing, and twisting. AR530. Mr. Lathrop also reported associated migraines and problems breathing. AR530. Examination revealed he was overweight, neck tenderness with

decreased range of motion and pain on movement, decreased breathing sounds bilaterally, bilateral shoulder pain with motion, cervical spasm, mild right scap winging and thoracic tenderness. AR532. Dr. Peterson's assessments were cervical disc displacement with possible pseudoarthrosis, and thoracic sprain with significant thoracic complaints. AR533. Baclofen was prescribed and a thoracic MRI was ordered. AR533.

Mr. Lathrop was seen on March 26, 2015, after switching to Baclofen and reported pain in lower back radiating to his feet. AR526. X-ray of his spine showed minimal arthritis at multiple levels with minimal multilevel degenerative disc disease and lower facet hypertrophy, and he was switched back off Baclofen to meloxicam (Mobic). AR522, 528, 536. X-rays of his left leg were also obtained and revealed abnormal convexity lateral femoral head/neck junction suggesting femoral acetabular impingement. AR535.

Mr. Lathrop called the clinic on March 30, 2015, regarding his thoracic MRI and was told it showed severe narrowing of nerve spaces. AR525. Thoracic x-rays obtained on March 24, 2015, were found normal, (AR538), but the MRI revealed upper degenerative thoracic spondylosis, specifically:

> At C7-T1, disc osteophyte complex causes minimal central canal stenosis and moderate bilateral neural foraminal stenosis. At T1-2, disc osteophyte complex causes no central canal stenosis, severe right and moderate to severe left neural foraminal stenosis. At T2-3, disc osteophyte complex causes no central canal stenosis, moderate right and moderate to severe left neural foraminal stenosis. No neural foraminal stenosis at any other level. At T7-8, there is a disc osteophyte complex which causes mild central canal stenosis.

AR537.

Mr. Lathrop was seen by Dr. Peterson on April 21, 2015, for ongoing symptoms and EMG of the thoracic paraspinals was negative, but he still had severe pain. AR541. Dr. Peterson's assessment was thoracic sprain, severe degenerative disc disease. AR541.

Mr. Lathrop returned to see Dr. Adams on April 22, 2015, about "arthritis in his back and is here to discuss removal of the arthritis." AR569. Dr. Adams stated he thought the thoracic MRI "appears normal to me. The radiologist has read some foraminal stenosis in his thoracic spine but I don't think this is the cause of his issues at this time. The decompression at C6-7 looks completely appropriate with good decompression of the anterior thecal sac." AR571. He stated that he did not think Mr. Lathrop had any surgical options, and "I am not exactly sure the source of the pain and I think other treatment options for him would be to visit a pain management physician. . . ." AR571.

Mr. Lathrop went back to see Dr. Peterson on June 16, 2015, to follow up on his back pain, which he reported was worsening. AR566. He described the pain as piercing, sharp and stabbing and aggravated by bending, lifting, sitting, and standing with relief from lying down and medications. AR566. He also reported fatigue, gait disturbance, headaches, and back and neck pain. AR567. Examination revealed Mr. Lathrop was using a cane, and motor ability was difficult to assess due to pain. AR567. Dr. Peterson's assessment was neuralgia/neuritis with bilateral significant thoracic pain, increased pain by

sitting and standing, and positive pain on internal rotation of the left hip. AR567. Dr. Peterson recommended a functional capacity assessment. AR567.

Mr. Lathrop was seen on June 23, 2015, requesting a handicap sticker because he couldn't walk very far due to pain and was using a cane, and also a note for his lawyer stating he was unable to work. AR563. Dr. Frank, who was not Mr. Lathrop's regular doctor, told him he could provide the handicap sticker because he met the criteria for that but he would need to see his regular doctors regarding a letter about his ability to work. AR563.

Dr. Peterson provided testimony under oath on March 3, 2017, regarding her treatment of Mr. Lathrop and her opinions regarding his condition. AR313-334. Dr. Peterson's testimony included the following:

a. Dr. Peterson attended college at Harvard, medical school at Cornell and is board certified in physical medicine rehabilitation, electrodiagnostic medicine, sports medicine, and pain management. AR315-16, see AR330 (curriculum vitae).

b. Mr. Lathrop's problems breathing and shortness of breath were likely caused by his thoracic pain. AR320.

c. She observed Mr. Lathrop using a cane; he didn't need it for leg weakness, and she suspected it helped him balance because when people have a lot of spine arthritis, standing straight upright can be painful, and the cane can really help with that. AR320.

d. She read a report from Dr. Janssen from Sanford, and she had no disagreements with his report. AR320-21.

14

e.     She referred Mr. Lathrop for a functional capacity evaluation, reviewed the report following the evaluation, and agreed with the report. AR321.

f.     From what she knew and reviewing the exam record of Dr. Todd Johnson of the Siouxland Pain Clinic, she would agree with his diagnosis of myofascial pain syndrome. AR321.

g.     When treating Mr. Lathrop she was looking at both cervical and thoracic issues. AR322.

h.     The shoulder blades are in the thoracic area and extend over multiple thoracic vertebrae. AR325.

i.     Mr. Lathrop had disc osteophytes in his thoracic area that showed an objective cause for his mid back pain. AR326.

**2.     Avera Sacred Heart Hospital:**

Mr. Lathrop was seen on September 24, 2015, and received a cervical epidural steroid injection at C7-T1 due to degenerative disk disease, cervical stenosis, and cervical spondylosis. AR621.

Mr. Lathrop was seen on April 4, 2016, and received a cervical epidural steroid injection at C7-T1 due to cervical radiculopathy. AR622.

**3.     CNOS Dunes Clinic:**

Mr. Lathrop was seen on June 22, 2016, by orthopedic surgeon Michael Espiritu, MD, with neck pain, pain between the shoulder blades, and thoracic pain. AR628. He was seen for a second opinion regarding whether operative treatment or non-operative treatment was required. AR631. Mr. Lathrop was

ambulating with a cane, and examination revealed severely poor neck range of motion, tenderness in the cervical paraspinal muscles, with the most tenderness around T6/7. The doctor stated:

> gentleman who appears to have pain out of his proportion in his shoulder girdle muscles, paraspinal muscles, paraspinals of his thoracic spine. A lot of his symptoms actually seem like they are pain out of proportion as well as his stiffness because I have done this surgery before, and usually people do not have that much loss of motion. Also x-rays do not show significant arthritic changes at his upper levels of his cervical spine and sub axial spine for him to lose that much motion. All in all this may potentially be a myofascial pain syndrome as opposed to anything that a surgeon could fix. Still he is here for a 2nd opinion. Therefore I told him the next step would either be we get new MRIs of his cervical and thoracic spine to make sure he does not have intraspinal pathology or extraspinal pathology which could be treatment from a surgical standpoint. However, we do not actually have the MRI from 2015, and he wants me to look at that first before he does anything or gets a referral.

AR629.

Mr. Lathrop was seen again on July 20, 2016. AR631. No examination was performed, but the doctor had obtained and reviewed his prior MRI from 2015 and found that it revealed some upper thoracic spondylosis at C7-T1, minimal central stenosis, moderate bilateral neuroforaminal stenosis, right and left side neuroforaminal stenosis at T1-2, moderate right to moderate severe left neuroforaminal stenosis at T2-3, and a disc osteophyte causing mild central stenosis at C7-8. AR626-27. The doctor agreed Mr. Lathrop was not a surgical candidate and referred him to the Pain Clinic. AR632.

### 4. Siouxland Pain Clinic:

Mr. Lathrop was seen by Dr. Johnson on August 15, 2016, at the pain clinic for posterior neck pain radiating into shoulders and low back, upper

thoracic pain, and mid thoracic pain with some referred symptoms. AR638.
Mr. Lathrop was noted as having prior neck surgery, physical therapy, anti-inflammatories, and a couple of cervical epidural injections, which had short-term benefit. AR638. Dr. Johnson noted Mr. Lathrop's MRI revealed degenerative changes at C7-T1, T1-2, and T2-3 where there is moderate stenosis. AR638. Mr. Lathrop was most tender in the upper thoracic paraspinous muscles and lower cervical musculature. AR638. Mr. Lathrop's pain was worse with standing, sitting, walking, exercise, coughing, heat, movement, turning and upright activity. He avoided yard work, shopping, recreation, exercise, sexual activity, driving and self-care due to pain. AR638. Mr. Lathrop reported back pain, numbness, and moderate frequent headaches. AR639. Dr. Johnson diagnosed myofascial pain syndrome. Dr. Johnson performed trigger point injection of the thoracic paraspinous muscles. AR640-42.

Mr. Lathrop was seen by Dr. Johnson again on September 12, 2016, and reported marked improvement with the prior injection with his pain at 5/10. AR643. He complained more of mid to lower thoracic paraspinous muscle pain. AR643. Mr. Lathrop was ambulating with a cane and was tender to palpation over the thoracic paraspinous muscles bilaterally. AR643. Bilateral lower thoracic muscle trigger point injections were administered. AR644-45.

Mr. Lathrop was seen on October 17, 2016, for continued thoracic area pain and reported no relief from the prior injection. AR646. Examination revealed cervical spine tenderness, reduced range of motion and pain with

17

motion. AR647. Mr. Lathrop asked about trying Lyrica, and it was prescribed. Bilateral C6-7 facet injections were planned pending approval. AR647.

Mr. Lathrop was seen on October 31, 2016, for continued thoracic area pain and low back pain and reported that he felt the Lyrica had been beneficial. AR649. Mr. Lathrop received the previously planned bilateral C6-7 facet injections. AR652-53.

Ms. Lathrop was seen on March 16, 2017, with complaints of neck pain with headaches and lower back pain radiating down the leg. AR657. Mr. Lathrop reported significant benefit from his prior injection and received additional bilateral C6-7 facet injections. AR655-57. Dr. Johnson stated that the pathology on Mr. Lathrop's MRI coincides with his pain pattern. AR658.

### 5. OrthoWest Clinic:

Mr. Lathrop was seen on May 5, 2016, for an independent medical examination by Dr. O'Neil at the request of Merit Medical related to the car accident injury claim. AR592. Mr. Lathrop reported that while attempting to work after the car accident he had work restrictions, and when he requested an extension of the restrictions he was placed on short-term disability, and then fired when his FMLA expired and his short-term disability was denied. AR594.

Dr. O'Neil reviewed records and tests from immediately following Mr. Lathrop's car accident on July 3, 2013, which included a lumbar spine MRI that showed a small right foraminal disk herniation at L4-5 with contact of the exiting right L4 nerve root, and minimal grade 1 retrolisthesis at L5-S1. AR597.

Dr. O'Neil reviewed the initial treatment records from the emergency room after the rear-end automobile accident, and the records showed that in the emergency room following the collision Mr. Lathrop reported lower back pain and pain between his shoulder blades in addition to neck pain. AR597. Dr. O'Neil stated:

> I do not have a plausible explanation for his ongoing complaints of mid and upper thoracic and periscapular pain without any objective physical findings. All of his complaints are subjective. He does not have any palpable increase in muscle tone in these areas. His x-rays and MRI do not explain his complaints of pain. I also do not have a plausible explanation for why he requires the cane in his right hand for ambulation. He does not appear to be depending on the cane for any of his movements. Furthermore, I do not have a plausible explanation for his inability to passively and actively lift his arms beyond 110 degrees of flexion and abduction.

AR602.

Dr. O'Neil reviewed the functional capacity evaluation and noted that the study met the validity criteria and was deemed valid, but stated a repeat evaluation would be helpful because there was no mention of Mr. Lathrop's ability to actively or passively move his arms in flexion or abduction. AR603.

**6.  Sanford Spine Center Clinic:**

Mr. Lathrop was seen on July 1, 2016, for an independent medical examination by Dr. Janssen. AR572. Mr. Lathrop reported that he attempted to go back to work in December, 2013, and January, 2014, after his neck surgery in September, 2013, but was missing work 1-2 days per week due to pain. AR574. He said he was kept on restricted duty for six months with a lifting restriction of 20 pounds. AR574. He reported in the fall of 2014 he was

placed on short-term disability by his employer for 1 ½ months and fired in December 2014. AR574.

At the time of the exam, Mr. Lathrop reported ongoing pain in his neck and shoulder blades, and ongoing headaches 1-4 times per week. AR575. Mr. Lathrop reported using a cane when he walks because without it he leans forward, and the cane helps him to walk more straight. AR575.

Dr. Janssen stated that Mr. Lathrop's March 26, 2015, thoracic spine MRI revealed degenerative spondylosis at levels T1-T2, T2-T3, and T7-T8, and noted that, on March 30, 2015, Dr. Peterson noted that the MRI showed severe narrowing of the nerve spaces. AR582.

Dr. Janssen reviewed records and tests from immediately following Mr. Lathrop's car accident on July 3, 2013, which included a lumbar spine MRI that revealed at L4-L5 a small to moderate right foraminal disk herniation, which contacts the exiting right L4 nerve root and at L5-S1 a possible left small foraminal disk herniation. AR579. Dr. Janssen stated the conclusion was no acute post-traumatic osseous pathology with no posterior paraspinal muscular edema or hematoma. AR579.

Dr. Janssen reviewed the initial treatment records from the emergency room after the rear-end automobile accident and records showed that in the emergency room following the collision Mr. Lathrop reported lower back pain and pain between his shoulder blades in addition to neck pain. AR579.

Dr. Janssen stated he reviewed the functional capacity evaluation report prepared by Craig Riley from his assessment performed on July 21, 2015, and agreed with the findings and recommendations in the report. AR586.

Dr. Janssen also reviewed the examination report from Dr. O'Neil and specifically disagreed with Dr. O'Neil's assertion that he was unable to identify injuries to Mr. Lathrop's thoracic spine area resulting from the motor vehicle collision and that he had no plausible explanation for Mr. Lathrop's ongoing pain in the thoracic area. AR589. Dr. Janssen stated:

> It is established in the medical literature that disk injuries to the lower cervical spine can radiate to both the cervical and thoracic area. This is also something that I commonly see in my clinical practice. Mr. Lathrop had a disk injury to the C6-C7 level, which can commonly radiate to the neck, bilateral shoulders, as well as the upper back area. Therefore, to a reasonable degree of medical probability, there is a plausible explanation for Mr. Lathrop's ongoing complaints of mid and upper thoracic and parascapular pain. The explanation is his disk injury at C6-C7 which required surgery.

AR589.

### 7. Proactive Physical Therapy: July 2015 Functional Capacity Evaluation (FCE)

Mr. Lathrop was seen for a functional capacity evaluation by Craig Riley, a licensed physical therapist, on July 20-21, 2015, utilizing the Blankenship System. AR605. Total examination time was 3.5 hours over a period of two days. AR605. The evaluation was found valid with validity checks indicating "excellent effort and valid results." AR605.

The evaluation found that Mr. Lathrop demonstrated a "HIGH" pain profile, but did not demonstrate any symptom or disability exaggeration. AR605.

The evaluation found that Mr. Lathrop could perform less than the full range of LIGHT category work with specific exceptions to LIGHT work including: Mr. Lathrop cannot do any frequent lifting at any weight, and even occasional lifting is restricted, he does not have the ability to push or pull objects as a material handling capability, he cannot lift, carry, push or pull at the frequent or constant material handling frequency. AR605, 607. Mr. Lathrop could not lift any weight, even occasionally, overhead. AR607. He was restricted to only occasional bending, reaching, squatting, kneeling, and climbing, and never crawling. AR607. Mr. Lathrop's hand functions were limited to low speed assembly (non production rate) only, with no pushing or pulling capability. AR607, 613. Mr. Lathrop did not demonstrate non-material handling reaching ability. AR609.

Mr. Lathrop demonstrated lumbar spine limitations including 25% range of motion loss with bending, slow speed of movement, and abnormal movement pattern that correlated to his pain rating with overall only occasional non-material handling bending ability. AR610. Mr. Lathrop was observed to not overreact to his symptoms of pain. AR610.

Mr. Lathrop demonstrated hip and knee limitations including 50% range of motion loss with squatting, slow speed of movement, and abnormal movement pattern that correlated to his pain rating with overall no non-

material handling squatting ability. AR610. Mr. Lathrop was observed to not overreact to his symptoms of pain. AR610.

Mr. Lathrop demonstrated moderate range of motion loss with cervical side bending, rotation and protrusion, and major range of motion loss with cervical flexion, retraction, and extension. AR605. Mr. Lathrop was observed to hold his neck in a very stiff posture, and his movement pattern matched his pain complaints fairly well. AR609.

### 8.    Great Plains Therapy:

Mr. Lathrop received physical therapy treatment in 2013 for his neck, back, and abnormal posture. AR420. When treated on August 1, 2013, Mr. Lathrop was extra sore after starting back to work even with light duty. AR421. He had severe decreased ROM of his neck and shoulders due to pain and muscle guarding. AR421. By August 21, 2013, the physical therapy records indicated Mr. Lathrop was no longer working. AR426. The appeal record documented that Mr. Lathrop had 21 physical therapy visits from approximately July, 2013, through September, 2013, at Great Plains Therapy. AR420-45.

### 9.    State Agency Assessments:

The state agency contacted Mr. Lathrop during their evaluation to clarify his allegation regarding breathing problems, and Mr. Lathrop told the agency that he did not have problems with his lungs; he explained that his breathing problems are caused by pain between his shoulder blades. AR71.

The state agency medical expert at the initial level on February 19, 2015, found severe disorders of back-discogenic and degenerative, and non-severe other disorders of the nervous system. AR72. The agency expert limited Mr. Lathrop to less than the full range of light work with only occasional push/pull due to his cervical spine injury and surgery, and only occasional reaching. AR73-4. There was no opinion evidence from any source in the file when the state agency assessment was completed. AR75.

The state agency medical expert at the reconsideration level on September 3, 2015, found severe disorders of back-discogenic and degenerative, and non-severe other disorders of the nervous system. AR72. The agency expert limited Mr. Lathrop to less than the full range of light work with only occasional push/pull due to his cervical spine injury and surgery, and only occasional reaching. AR73-4. The reconsideration level expert noted in her explanation that Mr. Lathrop had been assessed with a thoracic spine sprain, had thoracic spine muscle spasms, and the thoracic spine MRI showed some degenerative changes. AR86. There was no opinion evidence from any source in the file when the state agency reconsideration assessment was completed. AR75.

## D.  Testimony at ALJ Hearing

### 1.  Mr. Lathrop's Testimony

Mr. Lathrop testified that he last worked in the fall of 2014 at Kolberg Pioneer and was on short-term disability. AR38. Then when his FMLA ran

out, he was released from work. AR38. He said he had worked there almost 11 years. AR38.

When asked why he would not work, Mr. Lathrop testified he was having problems breathing, and explained that from the lower part of his chest up the back of his neck, his whole spine area hurts and radiates pain. AR40.

Mr. Lathrop testified that he gets migraine headaches, and before he started getting cortisone shots they were averaging three to five times per week, with some so severe he needed to isolate himself in a dark room. AR41. After the cortisone shots the frequency dropped to one to two times per week and they are generally less severe. AR41.

Mr. Lathrop testified that he did not receive any unemployment benefits when he lost his job because he was found physically unable to work. AR54.

### 2.    Vocational Expert Testimony

The ALJ's first hypothetical question to the vocational expert ("VE") was to consider:

> an individual who can lift and carry 20 pounds occasionally, 10 pounds frequently. Stand or walk six hours in an eight hour day, sit six hours in an eight hour day. Occasionally push and pull with bilateral upper extremities. Frequently negotiate ramps and stairs, occasionally negotiate ladders, ropes, scaffolds. Frequent stoop, kneel, crouch and crawl. AR57.

The VE testified that the individual would not be able to perform any of Mr. Lathrop's past work and initially testified there would be no other jobs, but then after further questions testified there was one sedentary job of surveillance system monitor, DOT# 379.367-010. AR57-58.

25

The ALJ then asked the VE about an individual with the same hypothetical limitations as the first hypothetical question, except with frequent push pull ability rather than occasional, and the VE testified the individual could perform the jobs of hand packager, DOT# 559.687-074; labeler, DOT # 920.687-014; and inserter, DOT# 794.687-058. AR60.

The VE testified that if a person was absent, tardy, or forced to leave early from work two or more times per month there would be no jobs they could perform. AR59-60.

The VE testified that if a person due to pain was unable to concentrate or was otherwise off task or not productive for more than five percent of any work day there would be no jobs they could perform. AR62-63.

**E.   Other Evidence**

Mr. Lathrop submitted South Dakota Department of Labor determinations that he was not entitled to unemployment compensation because he had been found unable to work commencing November 30, 2014. AR184, 212-13.

Mr. Lathrop submitted a vocational report from Tom Audet, dated January 26, 2016, in which Mr. Audet stated based on limitations identified in the functional capacity evaluation performed by Craig Riley, Mr. Lathrop had a reduction in employability of 90% and a loss of access to the labor market of 96%. AR290. Mr. Audet's report indicated that Mr. Lathrop's need to recline a portion of the day would eliminate any possible jobs remaining. AR290.

Mr. Audet explained further when he testified at Mr. Lathrop's hearing that if Mr. Lathrop needed to recline more than even five percent of the work day he would be unemployable. AR64.

Mr. Lathrop submitted an affidavit (AR356) from his daughter who stated:

1. I am the daughter of Michael J. Lathrop, Social Security Disability applicant. I live with my Dad and younger brother.

2. I am fifteen years of age and attend High School in Yankton, SD. I am on the Dean's list.

3. I know my dad can't lift anything heavy, can't sit, stand or walk anywhere for too long. He sits in his recliner at home a great deal for pain relief purposes. Dad spends most of his time at home in the recliner.

4. I do not see him do much of anything physical – not play games with us etc.

5. He usually uses his cane around the house.

6. I take care of mowing the lawn at Dad's direction. I do a lot of the real cooking. I wash most of the clothes. My brother and I do the lifting at the grocery store.

7. I do most of the house cleaning – my little brother does some, but he is not much help.

8. I usually drive Dad. He sits on the passenger's side. When asked if I drive the car alone, my answer was and is this: it takes special insurance, we do not have enough money for that special insurance.

9. I play in the school band and I see my Dad at band concerts getting up and moving around.

10. At home when he sits down or stands up I see him struggling.

11. Yes, I see Dad struggle with breathing, slightly groaning getting in and out of chairs. I see this when there is no other person except him and me present!

Mr. Lathrop's earnings record showed SGA and above earnings consistently from at least 1997 through 2014 with earnings in excess of $30,000 per year in each of the last eleven years he worked.  AR196.

## DISCUSSION

### A.  Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal punctuation altered, citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed merely because substantial evidence would have supported an

opposite decision. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

## B.    The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any

29

other substantial gainful activity which exists in the national economy.

42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

Step One: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

Step Three: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320, n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

Step Four: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ

considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

Step Five: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C. Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

## D. The Parties' Positions

Mr. Lathrop asserts the Commissioner erred by finding Mr. Lathrop not disabled within the meaning of the Social Security Act. He asserts the Commissioner erred in three ways: (1) the Commissioner failed to properly

identify Mr. Lathrop's severe impairments; (2) the Commissioner's determination of Mr. Lathrop's RFC is not supported by substantial evidence; and (3) the Commissioner erred in evaluating Mr. Lathrop's "subjective symptoms" (formerly credibility assessment). The Commissioner asserts substantial evidence supports the ALJ's determination that Mr. Lathrop was not disabled during the relevant time frame and the decision should be affirmed.

## E.   Analysis

Mr. Lathrop's arguments are addressed in turn below:

### 1.   Whether the Commissioner Failed to Properly Identify Mr. Lathrop's Severe Impairments?

The ALJ's written decision is contained at AR10-21. That portion of the ALJ's analysis in which the ALJ identifies Mr. Lathrop's impairments at step two is found on pages 3-4 (AR12-13) of the written decision. Mr. Lathrop asserts the ALJ failed to properly identify several of his severe impairments.

#### a.   Applicable Law and ALJ Findings

The ALJ identified a single severe impairment—cervical spine disc degeneration, status post C6-7 anterior cervical discectomy and fusion. AR12. Mr. Lathrop asserts the ALJ erred by failing to find his (1) myofascial pain syndrome; (2) headaches; (3) hip impairment/femoral acetabular impingement; and (4) thoracic/lumbar spinal impairments to be severe impairments.

The Commissioner alleges any error at step two was harmless because the ALJ continued on with the analysis through steps three through five and

considered all of Mr. Lathrop's impairments at these latter stages. Mr. Lathrop alleges the ALJ's step two error was not harmless precisely because the ALJ did *not* consider the four conditions listed above at steps four and five.

It is the claimant's burden to demonstrate a severe medically determinable impairment at step two, but that burden is not difficult to meet and any doubt about whether the claimant met his burden is resolved in favor of the claimant. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001); and Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008) (citing SSR 85-28). An impairment is not severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1522(a). Basic work activities include, but are not limited to: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, use of judgment; responding appropriately to supervisors and co-workers and usual work situations, dealing with changes in a routine work setting, and understanding, carrying out, and remembering simple instructions. Id. at (b). See also Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (the sequential evaluation may be discontinued at step two when her impairment has no more than a "minimal" impact upon her ability to work.).

Whether failure to identify a severe impairment at step two is harmless error or grounds for reversal is a murky issue in the Eighth Circuit. In Nicola v. Astrue, 480 F.3d 885, 886-87 (8th Cir. 2007), the claimant alleged the ALJ failed to identify a severe impairment of borderline intellectual functioning at

step two. The Eighth Circuit noted when such a diagnosis is supported by sufficient medical evidence, it should be considered severe. Id. The court held the ALJ's failure to identify the impairment as severe was not harmless error. Id. The court reversed and remanded the case to the commissioner for further proceedings. Id.

As noted in Lund v. Colvin, 2014 WL 1153508 (D. Minn. Mar. 21, 2014), the district courts within the Eighth Circuit are not in agreement about the holding of Nicola. Some courts have interpreted it to mean that an ALJ's erroneous step-two failure to include an impairment as severe warrants reversal and remand, even when the ALJ found other impairments to be severe and therefore continued the sequential analysis. See Lund 2014 WL 1153508 at *26 (gathering cases). Other courts have declined to interpret Nicola as establishing a *per se* rule that any error at step two is reversible error, so long as the ALJ continues with the sequential analysis. Id. The central theme in the cases which hold reversal is not required is that "an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC." Id.

More recently, this district court has interpreted Nicola to require reversal for failure to properly identify a severe impairment at step two, when that impairment is diagnosed and properly supported by sufficient medical evidence. See Quinn v. Berryhill, 2018 WL 1401807 at *6 (D.S.D. Mar. 20, 2018) (error at step two not harmless where ALJ failed to identify medically determinable impairments). In Quinn the court acknowledged the district

court split within the Eighth Circuit as described in <u>Lund</u>, but decided that in Quinn's case, the error was not harmless. <u>Id.</u> at * 11.

### b. Myofascial Pain Syndrome[5]

Mr. Lathrop alleges he is impaired due in part to myofascial pain syndrome. The ALJ did not identify myofascial pain syndrome as an impairment at all, let alone deem it severe or non-severe. This failure, Mr. Lathrop argues, was fatal to the validity of the remaining steps of the five-step process.

Mr. Lathrop did not identify myofascial pain syndrome *per se* as a disabling impairment on his disability applications. <u>See</u> AR218 (disability report dated December 22, 2014). Instead, Mr. Lathrop simply indicated his

---

[5] Myofascial pain syndrome is a chronic pain disorder. In this condition, pressure on sensitive points in your muscles (trigger points) causes pain in the muscle and sometimes in seemingly unrelated parts of your body. This is called referred pain.

This syndrome typically occurs after a muscle has been contracted repetitively. This can be caused by repetitive motions used in jobs or hobbies or by stress-related muscle tension.

While nearly everyone has experienced muscle tension pain, the discomfort associated with myofascial pain syndrome persists or worsens. Treatment options include physical therapy and trigger point injections. Pain medications and relaxation techniques also can help.

<u>See</u> https://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/symptoms-causes/syc-20375444 (all internet references cited herein last accessed on January 3, 2019).

disabling condition was "pain in upper middle back, headaches, problems breathing."

Myofascial pain syndrome was first identified as a possible source of Mr. Lathrop's pain in June, 2016, by Dr. Espiritu at the CNOS clinic in Dakota Dunes. AR628. The context of this visit was Mr. Lathrop's referral to Dr. Espiritu (an orthopedic surgeon) for a second opinion to determine whether Mr. Lathrop was a surgical candidate. Id.

After he had undergone his C6-7 anterior cervical discectomy with Dr. Adams in late September, 2013, Mr. Lathrop saw Dr. Espiritu in June, 2016, in an attempt to determine the cause of his ongoing pain. Id. Mr. Lathrop was walking with a cane, his examination revealed severely poor range of motion, tenderness in the cervical paraspinal muscles, with most tenderness in the thoracic spine at the T6/7 area. AR629.

At this visit, Dr. Espiritu had not yet obtained Mr. Lathrop's 2015 thoracic MRI, but Dr. Espiritu stated he felt Mr. Lathrop had pain and stiffness which was "out of proportion" because he (Dr. Espiritu) had performed the same type of cervical surgery Mr. Lathrop had undergone, usually these patients had less loss of motion, and Mr. Lathrop's x-rays did not show significant arthritic changes. AR629. Dr. Espiritu stated:

> All this may be potentially be a myofascial pain syndrome as opposed to anything that a surgeon could fix, still he is here for a 2nd opinion. Therefore I told him the next step would either be we get new MRIs of his cervical and thoracic spine to make sure he does not have intraspinal pathology or extraspinal pathology which could be treated from a surgical standpoint. However, we do not actually have

36

the MRI from 2015, and he wants to look at that first before he does anything or gets a referral.

Id.

Following this initial consultation, Dr. Espiritu reviewed the 2015 thoracic MRI, then Mr. Lathrop returned for another consultation on July 20, 2016. AR 626-27. Dr. Espiritu indicated the 2015 thoracic MRI showed: upper thoracic spondylosis at C7-T1, minimal central stenosis, moderate bilateral neuroforaminal stenosis, at T1-T2 no significant central stenosis, but bilateral neuroforaminal stenosis. At T2-3 no central stenosis, moderate right to moderate-severe left neuroforaminal stenosis. At T7-8,[6] there is a disc osteophyte causing mild central stenosis. Dr. Espiritu saw no cord signal changes indicating a spinal cord injury. AR627.

These findings did not change Dr. Espiritu's earlier opinion that Mr. Lathrop was not a surgical candidate. Id. Dr. Espiritu referred Mr. Lathrop to the Pain Clinic for treatment of a possible chronic pain syndrome. Id.

In August, 2016, Mr. Lathrop saw Dr. Johnson at the Siouxland Pain Clinic. AR638. Mr. Lathrop reported symptoms of posterior neck pain radiating into his shoulder and low back, along with upper and mid-thoracic

---

[6] The medical note actually says T7-8 (AR627), but the parties' stipulated facts indicate C7-8 Docket 13, SF 51. This is apparently a typographical error, because there is no 8th vertebra in the cervical spine. See https://www.spine-health.com/conditions/spine-anatomy/cervical-vertebrae.

pain.  Id.  Dr. Johnson reviewed Mr. Lathrop's MRI results, took a history from Mr. Lathrop, and performed a physical exam.  Id.  Dr. Johnson diagnosed Mr. Lathrop with myofascial pain syndrome.  AR640.  He administered trigger point injections of the thoracic paraspinous muscles.  AR640-42.

Mr. Lathrop initially reported improvement from the injections (AR643) but still walked with a cane and reported bilateral tenderness over the thoracic paraspinous muscles.  Id.  By October, 2016, Mr. Lathrop reported he'd received no relief from the injection he'd received at his previous visit.  AR646. He asked to try a different medication.  AR647.  More injections were planned. AR647.  By March, 2017, Dr. Johnson's plan was to continue with both medication and injections for Mr. Lathrop, and Dr. Johnson stated Mr. Lathrop's MRI findings supported his pain pattern.  AR658.

As further support for his assertion the ALJ should have identified myofascial pain syndrome as a severe impairment, Mr. Lathrop directs the court to the deposition of Dr. Judith Peterson.  AR315-28.[7]  Dr. Peterson obtained her undergraduate degree from Harvard and her medical degree from Cornell University.  AR315.  She is board certified in physical medicine and rehabilitation.  Id.  Dr. Adams, Mr. Lathrop's spine surgeon, referred Mr. Lathrop to Dr. Peterson in March, 2015.  AR530.  During her deposition,

_____

[7] The ALJ had the benefit of reviewing the transcripts of sworn deposition testimony from both Dr. Peterson and Dr. Adams, which were in the administrative record.  AR 315-28 (Dr. Peterson); AR 337-345 (Dr. Adams). These depositions were apparently taken for purposes of a civil lawsuit.

Dr. Peterson testified that she agreed with Dr. Johnson's diagnosis of Mr. Lathrop's myofascial pain syndrome. AR321.

The state agency physicians both completed their assessments before Mr. Lathrop's treating physician first opined Mr. Lathrop had myofascial pain syndrome. See (AR72—state agency initial level; AR83—state agency reconsideration). The state agency doctors did, however, identify "other disorders of the nervous system" as a non-severe impairment. Id. Their notes are replete with acknowledgments of Mr. Lathrop's ongoing complaints of cervical and thoracic pain and refer to Mr. Lathrop being assessed with "neuralgias/neuritis." AR 86. The state agency physicians imposed push/pull and reaching restrictions upon Mr. Lathrop based upon his pain complaints. AR85-86.

The opinion from Dr. Johnson and Dr. Peterson's deposition testimony indicating she agreed with Dr. Johnson's opinion that myofascial pain was the cause of Mr. Lathrop's ongoing pain is the only opinion from a qualified health professional in the record regarding this medical impairment. Though both Dr. Johnson and Dr. Peterson opined Mr. Lathrop was afflicted with this impairment, neither was specifically asked whether it was "severe" in Social Security lingo.

The ALJ did not directly discuss to Dr. Johnson's opinion and gave "no weight" to Dr. Peterson's opinions which, in part, adopted Dr. Johnson's assignment of myofascial pain syndrome as the reason for Mr. Lathrop's ongoing pain. AR19. The step two issue as to Mr. Lathrop's medical

impairments, therefore, depends very much on whether the ALJ was justified in according "no weight" to Dr. Peterson's opinions.

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

> --whether the opinion is consistent with other evidence in the record;
>
> --whether the opinion is internally consistent;
>
> --whether the person giving the medical opinion examined the claimant;
>
> --whether the person giving the medical opinion treated the claimant;
>
> --the length of the treating relationship;
>
> --the frequency of examinations performed;
>
> --whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;
>
> --the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;
>
> --whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and
>
> --whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527); Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole,

especially when they are contradicted by the treating physician's medical opinion. Wagner, 499 F.3d at 849; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue 513 F.3d 788, 792 (8th Cir. 2008)(citing Casey, 503 F.3d at 691-692). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008).

Here, the ALJ's given reasons for according "no weight" to the opinions of Dr. Peterson, who endorsed Dr. Johnson's diagnosis of myofascial pain syndrome are conclusory.[8] They are contained in the following paragraph:

> The undersigned has considered the depositions of Judith Peterson, MD, and Brent Adams, MD (Exhibits 21E and 22E). These were generated for purposes of a private adversarial action. In the depositions, Dr. Adams addressed the "light" work restrictions and Dr. Peterson addressed the use of a cane and generally endorsed the functional capacity assessment. However, these statements are generally cursory, vague, and are geared more toward causation than cumulative impact on work. Accordingly, these are given no weight.

---

[8] The ALJ lumped his assessment of Dr. Peterson's opinions together with his assessment of Mr. Lathrop's other treating physician—Dr. Adams—who performed Mr. Lathrop's cervical discectomy and fusion surgery in September, 2013.

AR19. That the medical opinions were obtained for purposes of a civil lawsuit is not a reason to discount them. A deposition transcript—wherein the deponent is subject to vigorous cross-examination-- is apt to provide more, not less, thorough information than the typical check-the-box forms from which an ALJ usually is forced to extract medical opinions in an administrative record.

Additionally, causation and the effect of Mr. Lathrop's impairments upon his ability to work were *both* issues discussed during Dr. Peterson's deposition. The lawyers specifically asked Dr. Peterson whether she agreed with Dr. Johnson's opinion that myofascial pain syndrome could be the cause of Mr. Lathrop's ongoing pain, *and* whether she endorsed the physical restrictions imposed upon Mr. Lathrop by Craig Riley, PT. Dr. Peterson answered affirmatively to both of those questions. AR25-26, 28. Dr. Peterson is a well-qualified physician who is board-certified in Physical Medicine and Rehabilitation, and has degrees from Harvard and Cornell University.

The Commissioner argues in brief that it is clear the ALJ considered myofascial pain syndrome in its decision, because when determining the RFC, the ALJ stated "[t]his is not to say that these providers have suggested malingering or faking, rather, chronic pain, fibromyalgia, or a myofascial pain syndrome have been suggested . . . However, the lack of objective support raises questions about the medical necessity of the claimant's alleged limitations." AR16 (emphasis in ALJ's written decision). The only way this

statement makes sense is to conclude the ALJ accepted myofascial pain syndrome as a medical impairment.

The ALJ indicated it accepted that Mr. Lathrop was not malingering because none of his physicians had indicated as much but they had instead concluded myofascial pain syndrome was the cause of Mr. Lathrop's otherwise unexplainable ongoing pain symptoms. To accept that conclusion but fail to account for the resulting pain symptoms in Mr. Lathrop's RFC constitutes error.

In her brief, the Commissioner asserts the ALJ's failure to identify myofascial pain syndrome as a severe impairment is harmless error because: (1) Mr. Lathrop's treatment history was inconsistent with his allegations; and (2) there was a lack of support for any limitations caused by the impairment beyond those the ALJ included in the RFC. The court rejects both of these contentions.

First, the ALJ never cited Mr. Lathrop's lack of treatment history for myofascial pain syndrome as a reason for failing to acknowledge that condition as a medically determinable impairment—whether severe or non-severe. The ALJ simply did not mention myofascial pain syndrome during the step two discussion. The Commissioner cannot rehabilitate, and this court cannot review, the ALJ's decision making process based on *post-hoc* rationalizations. SEC v. Chenery Corp., 332 US 194, 196 (1947); Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).

Second, any argument that Mr. Lathrop did not treat for chronic pain is simply incorrect. Mr. Lathrop was referred to Dr. Peterson in March, 2015, for pain in his upper back, middle back, and neck. AR530. He began taking Balcofen.[9] AR533. Two days later he reported pain radiating all the way down to his feet, so he was switched off Balcofen and back to Mobic.[10] Mr. Lathrop called Dr. Peterson's clinic at the end of March, 2015, and returned to see Dr. Peterson in April, 2015, reporting severe pain. AR541. Mr. Lathrop returned to his surgeon (Dr. Adams) in April, 2015, seeking to have the "arthritis" removed from his thoracic spine. AR569. When Dr. Adams told Mr. Lathrop surgery was not an option, Mr. Lathrop returned to Dr. Peterson in June, 2015, for relief from his worsening pain. AR566. Dr. Peterson sent Mr. Lathrop for a functional capacity assessment. AR567.

Mr. Lathrop received cervical steroid injections in September, 2015, and April, 2016. AR621-22. Dr. Adams sent Mr. Lathrop to see Dr. Espiritu for a second opinion, who did not recommend further surgery but did recommend a pain clinic. In August, 2016, Mr. Lathrop saw Dr. Johnson at the Siouxland pain clinic. AR638. There, Mr. Lathrop underwent more trigger point injections—this time of the thoracic paraspinous muscles. AR640-42. Mr. Lathrop underwent more bilateral trigger point injections of the thoracic

---

[9] Balcofen is a muscle relaxant.  www.rxlist.com

[10] Mobic is also known as Meloxicam, and is a non-steroidal anti-inflammatory (NSAID) prescribed for pain and swelling.  www.rxlist.com

muscles on September 12, 2016. AR644-45. He underwent bilateral cervical facet injections on October 31, 2016, and at that same time had switched to yet another medication (Lyrica) in an attempt to quell his muscle pain. AR652-53. Mr. Lathrop returned five months later for further bilateral C6-7 facet injections. AR655-57. He was still taking Lyrica, along with four tablets of ibuprofen every 6-8 hours. Id. Mr. Lathrop testified that as of the hearing date (March 27, 2017) he continued to take Meloxicam, ibuprofen, and Lyrica. AR44.

Finally, the Commissioner in her brief asserts Mr. Lathrop's allegation of myofascial pain syndrome was properly ignored altogether by the ALJ because the manner in which Mr. Lathrop treated for this impairment was inconsistent with his claim that the impairment existed. The Commissioner asserts this supposed inconsistency is supported by Mr. Lathrop's own treating physician because Dr. Johnson described Mr. Lathrop's injections for his myofascial pain as having been "periodic" or "occasional." See Docket 18, p. 9.

The statement referred to by the Commissioner was lifted from a letter written by Dr. Johnson, apparently in response to an inquiry from Mr. Lathrop's personal injury attorney regarding Mr. Lathrop's condition, his prognosis, and his need for future treatment.

The commissioner's representation of Dr. Johnson's statement as it pertains to Mr. Lathrop's treatment and his condition is a gross mischaracterization of Dr. Johnson's letter. AR654. In reality, Dr. Johnson described the *appropriate treatment* for myofascial pain as being periodic,

46

occasional injections, and Dr. Johnson in his letter in no way implied that Mr. Lathrop had not followed the appropriate treatment protocol. AR654. The substance of Dr. Johnson's letter is reproduced in its entirety below:

> November 21, 2016
>
> Dear Mr. Blackburn:
>
> RE: Michael Lathrop
>
> I am writing this letter in response to a patient you represent by the name of Michael Lathrop. I have seen him at our pain clinic at Dakota Dunes and he has undergone injections in regards to his chronic pain. Please refer to my initial consultation and records for details of his care. In regards to some of your questions there is treatment for myofascial pain. This includes periodic occasional injections, medical management and continued stretching exercises. In regards to the extent and duration of his discomfort this is a variable abnormality which some people have complete resolution and others need continued care. I know this is a broad statement in regards to his long term prognosis but long term prediction can be challenging.
>
> If you have any other questions or concerns as stated earlier please refer to my records or you can contact me at the Siouxland Pain Clinic.
>
> Sincerely
> /s/
> Dr. Todd Johnson

AR654. The court rejects the Commissioner's assertion that the ALJ failed to identify myofascial pain syndrome as an impairment (severe or not severe) because Mr. Lathrop did not undergo appropriate medical treatment for this condition. The court rejects the Commissioner's claim on this score for two reasons: the ALJ never articulated this reasoning, and this argument is incorrect in any event.

The Commissioner's second contention is that any failure by the ALJ to include myofascial pain syndrome as a severe impairment is harmless error, because there was a lack of support for any limitations caused by myofascial pain syndrome beyond those the ALJ included in the RFC. Here, the court returns to the ALJ's comment about myofascial pain syndrome within the RFC discussion in the written decision. The ALJ purported to accept the idea that Mr. Lathrop was not malingering or "faking" his pain, but instead that Mr. Lathrop's pain was caused by what his physicians had suggested— myofascial pain syndrome. If that was the case, the ALJ should have determined what limitations were caused by myofascial pain syndrome, rather than refuse to even acknowledge it as a severe medical impairment. Instead, the ALJ stated "the lack of objective support raises questions about the medical necessity of the claimant's alleged limitations." AR16 (emphasis in original). That statement is completely circular.

To compound the problem, the ALJ not only rejected Craig Riley's functional capacity analysis which was endorsed by Mr. Lathrop's treating physician, but likewise rejected the push/pull and reaching limitations imposed by the state agency physicians who recognized the impairment of "other disorders of the nervous system" (compare AR 14, reciting ALJ's formulation of the RFC with AR18, discussing state agency physicians' opinions and rejecting their push/pull and reaching restrictions). Contrary to the Commissioner's argument, this court is left to speculate whether the ALJ accepted myofascial pain as a medical impairment, and more importantly,

whether the ALJ incorporated into the RFC *any* limitations associated with myofascial pain syndrome. Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011) (court should not be left to speculate regarding the basis upon which the ALJ denied the claimant's disability claim); Nicola, 480 F.3d at 886-87 (failure to identify claimant's severe impairment constituted reversible error); Lund, 2014 WL 1153508 at *26 (failure to identify severe impairment is reversible error if ALJ fails to account for corresponding limitations in the RFC); Quinn, 2018 WL 1401807 at *6 (failure to identify severe impairment reversible error when impairment was diagnosed and properly supported by sufficient medical evidence.).

Given the totality of the record, the court concludes the ALJ erred when it failed to determine myofascial pain syndrome was one of Mr. Lathrop's severe medical impairments at step two. As noted above, the showing required of a claimant at step two is not an onerous one. There are two opinions in the record from qualified treating medical professionals concluding Mr. Lathrop *did* have myofascial pain syndrome and that it was the cause of his ongoing pain. It is not "harmless error" for the ALJ to have failed to consider myofascial pain syndrome  severe at step two because that impairment is not accounted for anywhere in the ALJ's RFC formulation, as discussed above and subsequently in this opinion. Nicola, 480 F.3d at 887. The court will remand for the ALJ to reconsider its step two conclusions as to whether Mr. Lathrop's myofascial pain syndrome is severe.

### c. Headaches

Mr. Lathrop also asserts his headaches should have been identified as a severe impairment at step two of the ALJ's evaluation. The ALJ's written decision at step two is also silent as to Mr. Lathrop's headaches. AR12-13.

When discussing Mr. Lathrop's RFC (AR14-19), the ALJ briefly discussed Mr. Lathrop's headaches as follows: "[h]e complained of headaches that he said could occur 16-20 times per month, each time lasting 12-24 hours, though he stated that with current treatment, he experiences only 1-2 of these per week." AR15. The ALJ also noted Mr. Lathrop's treatment history did not support his headache complaints, which the ALJ characterized as "somewhat isolated and not persistent throughout the record." AR17. The ALJ did not indicate whether any limitations were included in the RFC to account for Mr. Lathrop's headaches complaints. Mr. Lathrop asserts this omission is reversible error because the vocational expert testified an individual who is late, leaves early, is absent as little as two times per month, or is off-task as little as five percent of the workday would be unemployable. See AR59-60, 62-63.

The record evidence regarding Mr. Lathrop's headaches is as follows:

On December 31, 2013, Mr. Lathrop was three months post cervical discectomy and fusion surgery. He reported to Dr. Adams that he had been getting "migraines more." AR474-75. On March 24, 2015, Mr. Lathrop reported migraine headaches associated with his upper and middle back pain

to Dr. Peterson. AR530. Mr. Lathrop's medications were ibuprofen and Meloxicam. Id.

On June 16, 2015, Mr. Lathrop again reported headaches to Dr. Peterson. Mr. Lathrop reported taking Meloxicam, along with up to 16-20 ibuprofen per day. AR566-67.

On July 1, 2016, Mr. Lathrop saw Dr. Janssen at the Sanford Spine Center. At that time, Mr. Lathrop described having 1-4 headaches per week, with pounding pain and sensitivity to light and sound, and with symptoms that lasted all day. Mr. Lathrop explained that lying down helped these symptoms. AR575.

On August 15, 2016, Mr. Lathrop reported "moderate headaches that come frequently" to Dr. Johnson at the Siouxland Pain Clinic. Mr. Lathrop continued to take ibuprofen and Meloxicam. AR639.

On March 16, 2017, Mr. Lathrop again reported occipital headaches which he described as migraines to Dr. Johnson. Mr. Lathrop's medications at this time were ibuprofen, Meloxicam, and Lyrica. AR657.

During his administrative hearing testimony (March 27, 2017), Mr. Lathrop described his headaches as migraine type headaches which had decreased in frequency since he began receiving cortisone shots. Mr. Lathrop testified that since he had begun receiving cortisone shots, his headaches had decreased in frequency to one or two times per week and the headaches were generally less severe than previously. Mr. Lathrop explained that "once in a

while" he will get a headache that is severe enough that he needs to isolate himself. AR41.

Here the court returns to the Commissioner's in brief argument regarding the reason it was not error for the ALJ to decline to identify Mr. Lathrop's headaches as a medically determinable impairment at step two. The Commissioner asserts the medical evidence supports the ALJ's determination that Mr. Lathrop's headaches were isolated and not persistent, and that it is the ALJ's job to resolve conflicts in the record, citing Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). Because there are conflicts in the record, the Commissioner argues, the ALJ's determination that headaches were not a medical impairment was within the ALJ's "zone of choice" and the court should affirm on this issue. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006).

The Commissioner cites the administrative record (AR600) for the proposition that Dr. Peterson released Mr. Lathrop to work in November, 2015, because Mr. Lathrop's headaches had "resolved." This page in the administrative record is not Dr. Peterson's record, but rather is from the report of the adverse IME physician (Dr. O'Neil) from the underlying civil lawsuit. This physician acknowledged Mr. Lathrop's C6-7 cervical spine discectomy and fusion surgery, but cast suspicion that he had pre-existing cervical disc disease in this area and that his ongoing pain in this region was of "unknown etiology." AR600. This physician also indicated there was no plausible explanation for

52

Mr. Lathrop's thoracic spine pain because there was no objective physical findings to support it. AR602.

As discussed elsewhere in this opinion, the other medical providers—including Mr. Lathrop's treating physicians and the physical therapist who performed the FCE (which was found to be a valid effort on Mr. Lathrop's part) all disagreed with Dr. O'Neil's opinions. See e.g. Dr. Janssen's opinion (AR589) specifically disagreeing that there was "no plausible explanation" for Mr. Lathrop's thoracic and parascapular pain. Additionally, even assuming Dr. Peterson released Mr. Lathrop to return to work because the first round of cervical injections "resolved" his headaches (Dr. O'Neil's words), the headaches clearly did not remain resolved, as evidenced by the repeated references in the medical records to headaches and migraine headaches until only eleven days before Mr. Lathrop's administrative hearing testimony, wherein he testified that he continued to have headaches one or two times per week.

The Commissioner in brief also cites one of Dr. Espiritu's records dated from July, 2016, wherein Dr. Espiritu recited Mr. Lathrop's history and noted Mr. Lathrop had earlier cancelled an appointment with a neurologist because his epidural steroid injection "took care of" his headaches. AR628. Later in that same office note, however, Dr. Espiritu recited Mr. Lathrop's then current symptoms (under "review of systems") and under neurological symptoms, noted that Mr. Lathrop was presently experiencing headaches. AR629.

Finally, the Commissioner argues that Mr. Lathrop experiences headaches only once or twice *per year*, citing AR572. That record is

Dr. Janssen's IME report dated July 1, 2016. Id. The page cited is from

Dr. Janssen's recitation of Mr. Lathrop's history, and does state Mr. Lathrop

suffered from one or two migraine headaches per year. Id. Later in

Dr. Janssen's report, however, under the CURRENT STATUS section of

Dr. Janssen's report (AR575), Dr. Janssen notes Mr. Lathrop at that time had

headaches 1-4 times *per week*. Id. Mr. Lathrop described these headaches as

pounding pain, with the pain in the front of his head. Id. He also described

sensitivity to light and sound, and symptoms that lasted all day. Id. For the

Commissioner to argue that the ALJ's decision to omit headaches altogether as

a medically determinable impairment based upon Dr. Janssen's July, 2016,

report, therefore, is disingenuous at best.

Whether the ALJ's failure to identify Mr. Lathrop's headaches as a severe

impairment constitutes reversible error is a close call in this case.

Mr. Lathrop's own testimony during the administrative hearing was that he

gets headaches "once in a while" and they are not as severe as in the past since

he began receiving epidural injections.

The record is clear, however, that Mr. Lathrop's headaches have not

resolved. Likewise, though Mr. Lathrop does not appear to seek out medical

treatment for the specific purpose of relieving his headache pain, his

headaches are frequently mentioned as a symptom or concurrent complaint

when he seeks relief for his other problems. He likewise does not appear to

take any prescription medications that are commonly used to treat migraine

headaches,[11] but he has reported taking extremely high doses of ibuprofen, which is a commonly used over-the-counter headache medicine. Headaches should at least have been identified as a medically determinable impairment at step two, and the "failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." Spicer v. Barnhart, 64 Fed. Appx. 173, 178 (10th Cir. 2003). See also Washington v. Shalala, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for reversal. We note that the ALJ failed to consider the Plaintiff's [impairment] in conducting the step-four inquiry. This failure, alone, would be grounds for reversal."). See also Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) (same). On remand, therefore, the ALJ should reconsider Mr. Lathrop's headaches as a medically determinable impairment. Specifically, the ALJ should make a specific determination at step two whether Mr. Lathrop's headaches are a severe or non-severe impairment, and what, if any, limitations the headaches have upon Mr. Lathrop's RFC at step four.

---

[11] See  https://www.healthline.com/health/migraine-drugs#triptans

#### d.    Hip Impairment/Femoral Acetabular Impingement[12]

The ALJ found at step two that Mr. Lathrop's femoral acetabular impingement was a medically determinable impairment, but that it was non-severe.  AR13.  The ALJ noted this condition had been diagnosed by an x-ray, but that Mr. Lathrop's physical exams had not been indicative of hip abnormality.  Id.  Mr. Lathrop contends the ALJ erred by finding this impairment to be non-severe.

Mr. Lathrop acknowledges he received little if any treatment for this condition.  He argues, however, that because it is undisputed this hip condition is a medically determinable impairment, the ALJ should have deemed it severe because the FCE revealed limitations which Mr. Lathrop asserts are linked to this impairment.  Specifically, the July, 2015, FCE indicated Mr. Lathrop had a limited range of motion, slow speed, abnormal movement pattern, and pain in the squatting test, and that Mr. Lathrop had "no" non-material handling squatting ability (AR610) (though the court notes the FCE elsewhere indicated Mr. Lathrop could "occasionally" engage in squatting).  AR607.

---

[12] Femoroacetabular impingement (FAI) is a condition in which extra bone grows along one or both of the bones that form the hip joint — giving the bones an irregular shape. Because they do not fit together perfectly, the bones rub against each other during movement. Over time this friction can damage the joint, causing pain and limiting activity. See, https://orthoinfo.aaos.org/en/diseases--conditions/femoroacetabular-impingement/

Because the ALJ failed to recognize his femoral acetabular impingement as a severe impairment, Mr. Lathrop argues, it failed to incorporate these functional limitation into his RFC. (Recall the AJL's formulation of the RFC contained limitations of "frequent" stooping, kneeling, crouching crawling, and climbing ramps and stairs, AR14). The Commissioner counters that the ALJ's classification of Mr. Lathrop's femoral acetabular impingement as non-severe was correct because Dr. O'Neil did not find any evidence that Mr. Lathrop had treated for hip pain (AR601) and Dr. Johnson's physical examination did not reveal Mr. Lathrop had any hip tenderness. AR640.

A medically determinable impairment is severe if it has more than a minimal impact upon the claimant's ability to work. Page, 484 F.3d at 1043; 20 C.F.R. § 404.1522(a). Because the ALJ identified Mr. Lathrop's acetabular femoral impingement as an impairment (albeit non-severe), the court will not reverse on this point unless there were functional restrictions related to the impairment which should have been, but were not, incorporated into the RFC at step four. Mr. Lathrop has not identified any such restrictions.

In brief, Mr. Lathrop cites AR567 (pain generated by hip rotation, identified by Dr. Peterson), and AR 657 (leg pain identified by Dr. Johnson) in support of his claim that femoral acetabular impingement should have been recognized by the ALJ as a severe impairment. But in neither of those records did the physician associate femoral acetabular impingement with Mr. Lathrop's reported hip/leg pain. In fact, the physician who diagnosed Mr. Lathrop's femoral acetabular impingement (Dr. Frank) explicitly stated he did <u>not</u> believe

it was the cause of Mr. Lathrop's leg pain. AR522. The ALJ did not err in its determination at step two that femoral acetabular impingement was not a severe impairment.

### e. Thoracic/Lumbar Spinal Impairments

The ALJ identified Mr. Lathrop's degenerative lumbar spondylosis and upper degenerative thoracic spondylosis and degenerative changes both as non-severe impairments at step two. AR13. Mr. Lathrop asserts this is error, and that both these spinal impairments should have been found to be severe.

Regarding the lumbar spine, the ALJ stated that a lumbar x-ray demonstrated minimal degenerative spondylosis (AR13, citing AR560) which the ALJ characterized as "clinically mild and . . . found to be nonsevere." AR13.

Mr. Lathrop, however, cites other record evidence which he argues indicates his lumbar spine impairment is severe. For example, Mr. Lathrop directs the court to several medical records wherein he complained of low back pain. AR526 (complained to Dr. Frank of lower back pain radiating to his feet); AR638 (complained to Dr. Johnson of low back pain); AR649 (complained again to Dr. Johnson of low back pain "LBP"); AR657 (complained to Dr. Johnson of low back pain "LBP" radiating down to his leg).

Further objective testing related to the lumbar spine contained in the record includes a lumbar MRI conducted on July 3, 2013, and interpreted by Dr. Janssen in 2016. AR579. That lumbar MRI revealed L4-5 small to moderate right foraminal disc herniation which contacts the exiting right L4

nerve root. Id. At L5-S1 there was a possible left small foraminal disc herniation. Id. Dr. Janssen's conclusion was no acute post-traumatic osseous pathology with no posterior paraspinal muscular edema or hematoma. Id. Dr. O'Neil, who performed the adverse IME in the civil proceedings, made these same observations about the lumbar MRI, and noted minimal grade 1 retrolisthesis at L5-S1. AR597. The court concludes the medical evidence, including the lumbar x-ray showing spondylosis and the MRI showing a disc herniation at L4-5 contacting the L4 nerve root is sufficient to establish the lumbar spine impairment.

As for functional limitations associated with his lumbar spine impairment, Mr. Lathrop cites Craig Riley's FCE, which observed Mr. Lathrop had a 25% range of motion loss with bending, slow speed of movement, and an abnormal movement pattern correlating with his pain rating, resulting in only an "occasional" ability to bend. AR610 (relating to lumbar spine bending ability). Assuming this functional restriction is valid it is more than minimal, or put another way, it significantly limits Mr. Lathrop's ability to perform basic work abilities. See 20 C.F.R. § 404.1522(a); Page, 484 F.3d at 1043.

The court finds the ALJ erred by deeming Mr. Lathrop's lumbar spine impairment non-severe. The court has already explained that the ALJ erred by giving "no weight" to the opinion of Dr. Peterson, Mr. Lathrop's treating physician. And though Craig Riley, the physical therapist who conducted the FCE is not an acceptable medical source pursuant to 20 C.F.R. § 404.1502, Dr. Peterson is an acceptable medical source. Dr. Peterson referred

59

Mr. Lathrop for the FCE, reviewed it when it was complete, and expressly endorsed Craig Riley's opinions as her own during her deposition. See AR 321. Mr. Riley found Mr. Lathrop did not exaggerate his symptoms and gave his full effort during the FCE (AR605). Dr. Peterson's opinion, therefore, that Mr. Lathrop had only an "occasional" ability to bend supports the conclusion that Mr. Lathrop's lumbar spine impairment significantly limited Mr. Lathrop's ability to perform basic work abilities. See 20 C.F.R. § 404.1522(a); Page, 484 F.3d at 1043. On remand, the ALJ should reconsider the severity of Mr. Lathrop's lumbar spine impairment.

As for Mr. Lathrop's thoracic spine impairment, the ALJ acknowledged Mr. Lathrop's thoracic spine MRI which indicated "upper degenerative thoracic spondylosis and degenerative changes." AR13. The ALJ nevertheless determined Mr. Lathrop's thoracic spine impairment was non-severe because "multiple examining physicians have noted that these findings are not significant and do not support the claimant's complaints of pain. Moreover, physical examinations have not indicated that the claimant has abnormalities apparent during examination that are indicative of significant thoracic spine dysfunction." Id. (citing AR602—Dr. O'Neil's IME report, AR627-29 (Dr. Espiritu's records, diagnosis myofascial pain); AR571 (Dr. Adams' record from April, 2015, stating he does not believe Mr. Lathrop has any surgical options, and disagreeing with the radiologist's interpretation of the thoracic MRI showing abnormality). The ALJ also cited nerve conduction studies of the

thoracic paraspinal muscles, which were negative (citing AR546) in support of its conclusion Mr. Lathrop's thoracic spine impairment was non-severe. AR13.

Mr. Lathrop asserts that regardless of whether his thoracic pain originated from the findings on the thoracic MRI or from a chronic pain syndrome (as opined by Drs. Espiritu and Dr. Johnson) the ALJ failed to adequately address his thoracic back pain because the ALJ "cherry picked" the records to ignore the evidence which supported existence of a severe impairment. Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004); Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009) (both stating the ALJ may not selectively consider medical evidence).

Mr. Lathrop cites the following record evidence in support of his claim the ALJ improperly deemed his thoracic spine impairment non-severe:

Dr. Janssen noted that Mr. Lathrop immediately reported pain between the shoulder blades after the 2013 motor vehicle accident. AR579. Dr. O'Neil likewise noted Mr. Lathrop immediately noted pain between the shoulder blades after the 2013 motor vehicle accident. AR597.

Mr. Lathrop's thoracic spine pain was consistently reported in the medical records. AR494 (September, 2013, visit to Yankton Medical Clinic); AR490 (September, 2013, visit to Yankton Medical Clinic); AR478 (October, 2013 visit to Dr. Adams); AR 476-77 (November, 2013, visit to Dr. Adams); AR471-72 (February, 2014, visit to Dr. Adams); AR468-69 (March, 2014, visit to Dr. Adams); AR464 (May, 2014, visit to Dr. Adams); AR463 (July, 2014, visit to Dr. Adams); AR460 (September, 2014, visit to Dr. Adams); AR530 (March,

2015, visit to Dr. Peterson); AR525 (March, 2015, call to Dr. Peterson's office); AR541 (April, 2015, visit to Dr. Peterson); AR569-71 (April, 2015, visit to Dr. Peterson); AR566 (June, 2015, visit to Dr. Peterson); AR628 (June, 2016, visit to Dr. Espiritu); AR575,582 (July, 2016, IME examination with Dr. Janssen).

Mr. Lathrop's thoracic spine impairment is supported by the objective medical evidence in the record as follows: the thoracic MRI revealed degenerative changes including disc osteophytes causing some central canal stenosis and neural foraminal stenosis at various levels ranging from mild to moderate. AR525, 537.

Dr. Peterson, Mr. Lathrop's treating physician, testified in her deposition that she treated Mr. Lathrop for both cervical and thoracic spine issues including the shoulder blades, which extend over multiple thoracic vertebrae (AR322, 325). She testified Mr. Lathrop's breathing problems were likely caused by his thoracic pain, and the thoracic MRI showed osteophytes in his thoracic spine that demonstrated an objective basis for his mid-back pain (AR320, 326). Dr. Peterson also testified the thoracic MRI showed degenerative spondylosis at multiple levels and severe narrowing of the nerve spaces. AR317. Dr. Janssen opined "it is established in the medical literature that disk injuries to the lower cervical spine can radiate to both the cervical and thoracic area. This is also something that I commonly see in my clinical practice. Mr. Lathrop had a disk injury to the C6-7 level, which can commonly radiate to the neck, bilateral shoulders, as well as the upper back area. Therefore, to a

reasonable degree of medical probability, there is a plausible explanation for

Mr. Lathrop's ongoing complaints of mid and upper thoracic and parascapular

pain. The explanation is disk injury at C6-7 which required surgery."

AR589.[13] Mr. Lathrop was referred to a pain clinic (Dr. Johnson) where he was

diagnosed with myofascial pain syndrome and treated with multiple injections.

AR638-58.

Mr. Lathrop further argues that it is impossible to evaluate whether, at

step four of the analysis, the ALJ properly included functional limitations

within the RFC that correlate with the thoracic impairment. Instead, at step

four, the ALJ simply reiterated its belief that a severe thoracic spine

impairment did not exist. AR15-16. Here again, the ALJ rejected the opinion

of Mr. Lathrop's treating physician (Dr. Peterson) in favor of the IME physician

(Dr. O'Neil) who found "no plausible reason" for Mr. Lathrop's thoracic spine

pain.

The court concludes the ALJ erred by finding Mr. Lathrop's thoracic

spine impairment not severe. The analysis here is similar to the analysis

regarding Mr. Lathrop's myofascial pain syndrome. Mr. Lathrop's physicians

may not be in complete agreement about what is causing his ongoing thoracic

spine pain—myofascial pain syndrome (Dr. Johnson and Dr. Peterson), or

--------------------------------------------------------

[13] The court notes Mr. Lathrop's surgeon, Dr. Adams, also attributed
Mr. Lathrop's ongoing pain to his cervical injury. Both in his deposition and
his written report, Dr. Adams referred to Mr. Lathrop's condition as cervicalgia.
AR339, 521.

referred pain from his cervical spine injury and surgery (Dr. Peterson, Dr. Janssen and Dr. Adams). But the ALJ conceded that though Mr. Lathrop's physicians concur his pain complaints seem to be out of proportion to his objective test results, they do <u>not</u> believe Mr. Lathrop is malingering or "faking" (AR16) and the FCE conducted by Mr. Riley and expressly endorsed by Dr. Peterson confirms that conclusion. AR605.

As discussed above, both Craig Riley and the state agency physicians assigned upper extremity physical restrictions based upon Mr. Lathrop's thoracic spine impairment which significantly limited his physical ability to do basic work activities. <u>See</u> AR84-85 (state agency physicians limited Mr. Lathrop to occasional push/pull and occasional overhead reaching); AR607 (Craig Riley, PT, limited Mr. Lathrop to occasional reaching and no pushing/pulling). For reasons discussed elsewhere in this opinion, the ALJ's rejection of these opinions in favor of the one-time IME physician (Dr. O'Neil) was error. On remand, the ALJ should re-examine whether Mr. Lathrop's thoracic spine impairment is severe.

### 2. Whether the Commissioner's Determination of Mr. Lathrop's RFC is Supported by Substantial Evidence?

Mr. Lathrop asserts the Commissioner's determination of the RFC is not supported by substantial evidence for three reasons. First, as explained above, Mr. Lathrop asserts the ALJ failed to identify as severe impairments and then failed to discuss in the RFC the effect of Mr. Lathrop's myofascial pain syndrome, headaches, hip impairments, and lumbar/thoracic spine

impairments.  Second, Mr. Lathrop alleges the ALJ improperly evaluated the

expert medical evidence.   Finally, Mr. Lathrop alleges the ALJ improperly

substituted his own opinions for the medical opinions in the record.

### a.    Law Regarding the RFC and the ALJ's Findings

Residual functional capacity is "defined as what the claimant can still do

despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d

700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC

assessment is an indication of what the claimant can do on a 'regular and

continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."

Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The

formulation of the RFC has been described as "probably the most important

issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147

(8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222

F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's

mental and physical impairments in combination, including those impairments

that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social

Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996); 20 C.F.R.

§§ 404.1520(e); 404.1545(a)(2).  Although the ALJ "bears the primary

responsibility for assessing a claimant's residual functional capacity based on

*all* the relevant evidence . . . a claimant's residual functional capacity is a

medical question."[14]  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id.  "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight.  If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

_____

[14] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . . In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "[t]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (cleaned up); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on

a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

Here, the ALJ's forumulation of the RFC is found at page five of its written opinion (AR14). The ALJ found Mr. Lathrop capaple of less than a full range of light duty work. Id. The ALJ found Mr. Lathrop capable of carrying 20 pounds occasionally and 10 pounds frequently. The ALJ also found Mr. Lathrop capable of standing/walking 6 hours out of an 8 hour workday. and that Mr. Lathrop could sit 6 hours out of an 8 hour workday. Id. The ALJ found Mr. Lathrop capable of frequent pushing, pulling, stooping, kneeling, crouching, crawling, and climbing ramps and stairs. Id. Finally, the ALJ found Mr. Lathrop capable of occasionally climbing ladders, ropes and scaffolds. Id.

### b.     The Necessity to Discuss Effects of All Impairments

Mr. Lathrop asserts this assignment of error is necessarily intertwined with his argument that the ALJ's error at step two requires reversal and remand. The court agrees. The ALJ's failure to acknowledge, let alone recognize as severe, Mr. Lathrop's myofascial pain syndrome and headaches as medical impairments necessarily infected the remainder of the five-step analysis, including the formulation of the RFC. Likewise, the ALJ's failure to account for the physical restrictions associated with these impairments in the RFC requires reversal and remand. This is because the ALJ is required at step four to consider physical restrictions presented by all the claimant's medically determinable impairments, including severe and non-severe impairments.

Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996); 20 C.F.R. §§ 404.1520(e); 404.1545(a)(2).

For the reasons discussed above in sections E.1.b and E.1.c, the ALJ's formulation of the RFC is necessarily flawed because the ALJ failed to recognize as medical impairments (severe or non-severe) let alone account for the functional restrictions presented by Mr. Lathrop's myofascial pain syndrome and his headaches.

The ALJ accepted Mr. Lathrop's lumbar and thoracic spine impairments as non-severe impairments, as discussed in section E.1.e above. But the ALJ did not incorporate the appropriate corresponding functional restrictions into the RFC—such as the "occasional" reaching or bending restrictions imposed by Mr. Riley, the "no" pushing/pulling restriction imposed by Mr. Riley, or even the "occasional" reaching, pushing and pulling restrictions imposed by the state agency physicians.[15]

Instead, the ALJ gave weight to the opinion of Dr. O'Neil, an IME physician who examined Mr. Lathrop once, and did not really even offer an opinion about Mr. Lathrop's functional restrictions but instead opined

---

[15] As discussed in section E.1.d, above, the court finds the ALJ did not err by failing to find Mr. Lathrop's femoral acetabular impingement a severe impairment, because the court does not find support for Mr. Lathrop's claim that this condition caused any corresponding functional restrictions in the record that were not otherwise incorporated into the RFC.

69

Mr. Lathrop should have another functional capacity evaluation (AR603)—a suggestion the ALJ did not follow.

This failure by the ALJ to appropriately recognize Mr. Lathrop's medical impairments, to appropriately categorize them as severe, and to incorporate their corresponding physical limitations into the RFC requires reversal and remand.

### c. Evaluation of the Expert Medical Evidence

Mr. Lathrop also asserts the ALJ's formulation of the RFC is flawed because it is based upon the ALJ's reliance on medical opinion evidence which was weighed erroneously by the ALJ. As the court explained in section E.1.b above, this court agrees with Mr. Lathrop on this score as well. The court reviews each expert medical opinion, the weight assigned, and the reasons offered by the ALJ:

ALJ gave *little weight* to the opinion of Craig Riley, physical therapist, because Mr. Riley was not an acceptable medical source and because the medical doctors had noted there was little objective evidence to support such limitations. AR18.

The ALJ gave *some weight* to the state agency physicians' light duty FCA, but rejected their assignment of occasional reaching, pulling and pushing restrictions. AR18. The ALJ reasoned that "such significant upper extremity restrictions are not consistent with the objective evidence of record, which generally reflects that the claimant's upper extremity strength is normal."

The ALJ gave *little weight* to the opinion of Dr. Janssen, who performed an independent medical examination upon Mr. Lathrop for purposes of the civil lawsuit. AR19.Dr. Janssen concurred with Mr. Riley's FCE conclusions. The ALJ gave Dr. Janssen's opinions little weight because the ALJ concluded Dr. Janssen "failed to address the upper extremity limitations, even though Dr. Janssen noted intact upper extremity range of motion and strength in the course of his examination." AR19.

The ALJ gave *some weight* to the opinion of Dr. O'Neil, the one-time IME examiner who found no plausible explanation for Mr. Lathrop's ongoing thoracic pain complaints and recommended that Mr. Lathrop undergo another FCE evaluation. The ALJ conceded Dr. O'Neil's report "did not provide a clear functional assessment" but noted it was a detailed report and his observations and conclusions were well-supported. AR19.

The ALJ gave *little weight* to the opinion of Dr. Adams,[16] Mr. Lathrop's treating surgeon, who attributed Mr. Lathrop's ongoing pain to cervicalgia and

---

[16] The court notes the ALJ apparently believed this opinion was a different opinion than that of the Dr. Adams (Mr. Lathrop's treating surgeon) who gave the deposition. The ALJ believed this opinion was from Dr. *Forest* Adams while Mr. Lathrop's surgeon is Dr. *Brent* Adams. A review of AR521 (EX4F from the administrative record) reveals it is signed by Dr. *Brent* Adams of the Yankton Medical Clinic, and gives a diagnosis of cervicalgia—the same diagnosis offered by Mr. Lathrop's surgeon, Dr. *Brent* Adams. Compare, AR521, AR339. The ALJ, therefore, gave Dr. Brent Adams' opinion both little and no weight. AR19.

opined Mr. Lathrop was permanently limited to light duty.  The ALJ deemed

Dr. Adams' opinion vague and without specific limitations.  AR19.

The ALJ gave the deposition testimony of Dr. Peterson and Dr. Adams

(both treating physicians) *no weight* because the ALJ noted these depositions

were given for the purpose of private litigation and decided their comments

about work restrictions were "generally cursory, vague, and geared more

toward causation than cumulative impact on work."  AR19.

The ALJ gave *some weight* to the opinion of Tom Audet, the vocational

expert who testified at the hearing.  Mr. Audet was privately retained for

purposes of the civil proceedings.  He opined that, assuming Mr. Lathrop

needed to lie down or recline at least 5% of the day, Mr. Lathrop would be

unemployable.  AR63-64.  See also, AR281-90 (Mr. Audet's report).  The court

notes the ALJ stated during the hearing that Mr. Audet was "well known" to the

Office of Disability Adjudication and Review (ODAR).  AR63.  This is because, in

this court's experience, the ODAR routinely—indeed almost exclusively--relies

upon Mr. Audet's vocational expertise.  The ALJ gave only some weight to

Mr. Audet's opinion because the ALJ did not accept the functional restriction

that Mr. Lathrop needed to lie down during the workday. AR20.

The ALJ had at its disposal in this case a luxury which is a rarity in a

Social Security file—the opinions of Mr. Lathrop's treating physicians

(Drs. Peterson and Adams) which were subjected to the rigors of cross-

examination given under the penalty of perjury.  Yet inexplicably, the ALJ

completely rejected these opinions (i.e. gave them *no weight*) when determining Mr. Lathrop's RFC.

The court has already outlined the factors to be considered when weighing medical opinions in section E.1.b of this memorandum opinion and order. See also 20 C.F.R. § 404.1527.[17] They are: whether the opinion is consistent with other evidence in the record; whether the opinion is internally consistent; whether the person giving the opinion actually examined the claimant; the person giving the opinion treated the claimant; the length of the treating relationship; the frequency of the examinations; whether the opinion is supported by relevant evidence—especially medical signs and lab findings; the degree to which non-examining and non-treating physicians provide supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim; whether the opinion is rendered by a specialist about issues within the person's specialty; and whether any other factors exist to support or contradict the opinion. See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner, 499 F.3d at 848.

The ALJ gave little or no weight to every expert medical opinion of a provider who actually treated or examined Mr. Lathrop. As for Craig Riley's

---

[17] 20 C.F.R. 404.1527(c)(2) instructs that if a treating physician's opinion is well supported and not inconsistent with other substantial evidence, it is to be given controlling weight. This "treating physician rule" will no longer be applicable to claims filed after March 27, 2017, but it was applicable to Mr. Lathrop's claims, filed in 2014 and 2016. See https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html

opinion (expressly endorsed by Dr. Peterson, after Dr. Peterson referred Mr. Lathrop to Mr. Riley for the evaluation), the ALJ gave it little weight and stated that multiple medical doctors had noted there was a lack of objective evidence to support the limitations imposed by Mr. Riley. AR18. This is a misstatement of the record.

Drs. Adams, Peterson, Janssen, Johnson, and Espiritu—though not in complete agreement about the cause of Mr. Lathrop's pain—never questioned the validity of Mr. Lathrop's pain or suggested Mr. Lathrop was a malingerer. Dr. Janssen attributed Mr. Lathrop's pain to referred symptoms from his disc injury and surgical procedure at the C6-7 area. AR589. In his deposition, Dr. Adams attributed Mr. Lathrop's ongoing pain to cervicalgia. AR339. Drs. Espiritu, Peterson and Johnson attributed the ongoing pain to myofascial pain syndrome. AR321, 628, 640. None of these physicians, though they could not pinpoint the cause of Mr. Lathrop's ongoing problems, suggested the lack of objective test results meant that Mr. Lathrop's pain was not real, that Mr. Lathrop was malingering, or that a lack of objective medical evidence equaled the conclusion that Mr. Lathrop's physical limitations were unwarranted.

Mr. Riley's FCE (endorsed by Dr. Peterson), used the Blankenship method of testing and specifically tested for symptom magnification and for the reliability of the results of the exam. AR605. Mr. Riley's report explains the Blankenship method of testing in part on page nine of the report (AR616).

Under the heading "THE BLANKENSHIP BEHAVIORAL PROFILE" the following explanation appears:

> The Blankenship Behavioral Profile includes profiles for symptom/disability exaggeration, non-organic signs and validity. The symptom/disability exaggeration profile is subjective but the non-organic signs and validity profiles are objective. Patients scoring high on all three profiles are felt to be attempting to control the test results to demonstrate a greater level of disability than what is actually present, the motivation of which is not known. Any one of the three profiles may not be reported if insufficient data exists.

See AR616.

The Eighth Circuit has endorsed the validity of the Blankenship method of testing as objective evidence of a claimant's functional abilities. Baker v. Barnhart, 457 F.3d 882, 892 n.6 (8th Cir. 2006). In that case, the physical therapist conducted a functional capacity examination (FCE) using the Blankenship method and, as in this case, the results were endorsed by the claimant's treating physician. Id. 886-88. In Baker, however, unlike Mr. Lathrop, the FCE showed Baker was exaggerating his symptoms. Id. The Eighth Circuit noted the FCE was properly accepted by the ALJ and should have been accepted as valid by the district court because

> the FCE's conclusions about overall effort and symptom exaggeration are drawn in an empirical fashion by comparing the results of a large number of tests and observations. Because Baker did not submit any evidence to the ALJ challenging the reliability of the FCE methods employed by [the physical therapist], and because those methods were accepted by Dr. Durward. . . Baker's treating physicians, we see no reason not to accept the FCE results.

Id. at p. 892 n.6. Here, the ALJ gave no good reason for failing to accept the valid FCE, which was endorsed by Mr. Lathrop's treating pain management physician.

The FCE showed Mr. Lathrop was not exaggerating symptoms, that he gave "excellent" effort, and that the results were valid for vocational planning purposes. AR605. All of Mr. Lathrop's examining and treating physicians conclusions, therefore, were consistent with each other. This is a reason to give their opinions greater, not little or no, weight.

Further, the experts whose opinions were given little or no weight by the ALJ not only treated or examined Mr. Lathrop, but were all specialists: Pain management (Drs. Peterson and Johnson); physical medicine and rehabilitation (Dr. Peterson and Dr. Janssen); orthopedic surgery (Dr. Adams); physical therapy (Craig Riley). This is yet another factor the ALJ should have considered when weighing their opinions pursuant to 20 C.F.R. § 404.1527(c)(5).

An ALJ must "always give good reasons" for the weight afforded the treating medical opinions in the file. Reed, 399 F.3d at 920; 20 C.F.R. § 404.1527(c)(2). If the treating physicians' opinions are not given controlling weight, they must still be granted deference and weighed according to the factors in 20 C.F.R. § 404.1527. In many cases, this means the treating physicians' opinions are entitled to the greatest weight even when they are not entitled to controlling weight. See SSR 96-2p. In this case, the ALJ did not

give good reasons for assigning little or no weight to the specialized and consistent opinions of Mr. Lathrop's treating physicians.

### e. The ALJ Made Its Own Medical Inferences

Mr. Lathrop's final assignment of error as to the RFC is that because the ALJ formulated a functional capacity that was not supported by any medical opinion, the ALJ improperly substituted its own opinions for those of the medical experts. While it is true that the ALJ is free to formulate the RFC from all of the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009). These principles were recently reaffirmed in Combs v. Berryhill, 878 F.3d 642, 647 (8th Cir. 2017).

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations. That ruling contains requirements for the ALJ's narrative discussion. One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ." Id. at p. 13. Another is that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Id. at p. 14.

Here, the crucial restriction which was imposed by both Craig Riley's FCE, (endorsed by Dr. Peterson) and by the state agency physicians was Mr. Lathrop's upper extremity functional limitations. Specifically, the FCE limited Mr. Lathrop to "occasional" reaching. AR607. Further, it prohibited Mr. Lathrop from any pushing or pulling. Id. The state agency physicians likewise limited Mr. Lathrop to only "occasional" reaching, pushing and pulling. AR84-85. The Commissioner argued the ALJ properly imposed "frequent" push/pull and unlimited reaching limitations by resolving the conflict among the expert opinions, citing Wagner, 499 F.3d at 848. This is incorrect.

The ALJ rejected all the medical opinions and imposed its own upper extremity functional limitation of frequent push/pull and unlimited reaching limitations not by resolving the conflict among the experts (as no experts imposed those limitations) but instead by "set[ting] his own expertise against that of a physician who testified before him." Gober v. Matthews, 574 F.2d 772, 777 (3d Cir. 1978). The ALJ did so by reviewing medical records which showed normal upper extremity strength, and by drawing its own conclusion that this medical finding equated to a finding that either there was no objective reason for Mr. Lathrop's upper extremity functional limitations or that the FCE results were invalid. No medical expert stated the FCE was invalid. The ALJ acknowledged that Dr. O'Neil, the adverse IME physician, did not impose any particular functional limitations. AR19. Dr. O'Neil did not indicate Craig Riley's FCE was invalid, but suggested another FCE be performed. Id. But the ALJ did not have another FCE performed.

78

Instead, the ALJ imposed its own functional restrictions. The ALJ, however, may not substitute its own opinion for that of the physicians, and may not draw its own inferences as to the relevance of the medical records. Combs, 878 F.3d 647. On remand, the ALJ is instructed to give proper weight to the medical expert opinions in the file and refrain from substituting its own opinions for the physicians' opinions as to Mr. Lathrop's RFC.

### 3. Whether The Commissioner Erred in Evaluating Mr. Lathrop's "Subjective Symptoms" (Formerly Credibility Assessment)?[18]

Mr. Lathrop asserts the ALJ improperly discounted his subjective complaints. Specifically, Mr. Lathrop argues that though the ALJ discussed the Polaski factors, it really only gave weight to one factor: the objective medical evidence—and even then, the ALJ improperly interpreted the objective medical evidence.

### a. Law Regarding Subjective Symptoms and the ALJ's Findings

In determining whether to fully credit a claimant's subjective complaints of symptoms, the Commissioner engages in a two-step process: (1) first, is

---

[18] The court notes that as of March 28, 2016, the Commissioner discontinued the use of the term "credibility" in its sub-regulatory policy. See SSR 16-3p (which superseded SSR 96-7p). The Commissioner made clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character. Id. The court uses the term "credibility" herein because it is prevalent in the case law that has developed. Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work. See SSR 16-3p; 20 C.F.R. § 404.1529. Here, the ALJ found Mr. Lathrop had medically determinable impairments that could reasonably be expected to produce his symptoms, so the analysis is focused on the second part of the inquiry.

In evaluating the second prong of the analysis, an ALJ must consider several factors. The factors to consider include: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). A claimant's subjective complaints of pain may not be discredited solely because the objective medical evidence does not support them. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). Instead, a claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole. Polaski, 739 F.2d at 1322.

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). If adequately supported, credibility findings are for the ALJ to make. Id. (citing Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cor. 2006)). Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations so long as they are supported by substantial evidence and good reasons. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility."). The Eighth Circuit has said "in many

disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Woolf, 3 F.3d at 1213.

In Mr. Lathrop's case, the ALJ acknowledged his duty to consider the appropriate factors (AR14-15) and set forth his lengthy discussion of the factors (AR14-19), but Mr. Lathrop argues to this court the ALJ gave improper significance to the objective medical findings, as evidenced by the final sentence in the section of his written decision regarding the RFC: "In sum, the above residual functional capacity assessment is supported by the entire record, but largely by the objective findings and the claimant's modest treatment." AR20.

### b. The ALJ's Evaluation of Mr. Lathrop's Activities of Daily Living

The ALJ discussed Mr. Lathrop's activities of daily living at AR18. Mr. Lathrop reported he was capable of his own personal care. Id. He lived with his two children, ages five and fifteen. Id. He helped his children get ready for school. Id. He was capable of driving, but often relied upon his fifteen-year-old daughter to do the driving. Id. He prepared simple meals and shopped with his daughter. Id. He did "minimal" household chores. Id. The ALJ acknowledged Mr. Lathrop's reported daily activities were "quite modest" and did not reflect significant physical activity. Id. This finding would weigh in favor of crediting Mr. Lathrop's symptom complaints and their attendant affect upon his ability to function in the workplace.

The ALJ did not find this factor highly probative, however, because "the medical necessity of such limited activity is not supported by the medical record." AR18.

### c.    The ALJ's Evaluation of Mr. Lathrop's Work History

The ALJ also discussed Mr. Lathrop's work history. Id.  The ALJ acknowledged Mr. Lathrop had an "excellent" work history leading up to 2014, which was indicative of a positive work ethic and supported the idea that Mr. Lathrop would have returned to his past relevant work if he had been able to do so.  Id.  This finding would weigh in favor of crediting Mr. Lathrop's symptom complaints and their attendant affect upon his ability to function in the workplace.

The ALJ concluded, however, that the record as a whole supported its conclusion that Mr. Lathrop was able to perform the range of work set forth in the RFC formulated by the ALJ.  Id.

### d.    The ALJ's Evaluation of Third Party Evidence

As for third party evidence, the ALJ discussed the FCE conducted by Craig Riley, PT.  Id.  As discussed above, the ALJ rejected the FCE because Mr. Riley is not an acceptable medical source and because the ALJ stated "there is a lack of objective medical evidence" to support the limitations set forth by the FCE.  Id.

The ALJ also discussed an affidavit submitted by Mr. Lathrop's fifteen-year-old daughter.  AR19 (citing AR356).  Mr. Lathrop's daughter confirmed Mr. Lathrop's testimony regarding his daily activities and she observed that he

appeared to be in a significant amount of pain.  Id.  She explained Mr. Lathrop spent most of his time in a recliner.  Id.  She also explained she did most of the housework, yard work, and cooking.  Id.  The ALJ indicated it "generally accepted" these statements which correlated with Mr. Lathrop's statements. This finding would weigh in favor of crediting Mr. Lathrop's symptom complaints and their attendant affect upon his ability to function in the workplace.

The ALJ, however explained that this was lay testimony and did "not address the lack of objective evidence or more significant treatment."  AR19.

### e.    The ALJ's Evaluation of Mr. Lathrop's Medical Treatment

The ALJ reviewed Mr. Lathrop's medical treatment but determined it was "not entirely consistent" with his pain allegations.  AR16.  The ALJ noted Mr. Lathrop's surgical procedure—a fusion at the C6-7 level of his spine.  Id. The ALJ characterized Mr. Lathrop's post-surgical medical care, however, as "more limited."  Id.  Mr. Lathrop's post-surgical care included prescription (though non-narcotic) medication; EMG testing; referral to a pain specialist and a pain clinic; referral for a second opinion regarding further surgical options; repeated trigger point injections; and epidural steroid injections.

Despite these treatment modalities, the ALJ concluded Mr. Lathrop's treatment history did not support his allegations, because he had not

participated in physical therapy,[19] chiropractic care, or pool therapy, had not presented himself at the emergency room, and had not used narcotic drugs for pain relief.[20]  The ALJ concluded Mr. Lathrop's medical care had been "fairly modest."  AR18.

There is no suggestion in the record, however, that any of the treatment modalities that Mr. Lathrop did not undergo were medically appropriate or would have brought relief to Mr. Lathrop's symptoms.  As for Mr. Lathrop's epidural and trigger point injections, there is likewise no evidence in the record that Mr. Lathrop did not follow medical advice as to the frequency of this method of pain relief.

###    f.    The ALJ's Improper Emphasis on the Objective Medical Evidence

Though the ALJ discussed several elements above required by 20 C.F.R. § 404.1529, it consistently circled back to the objective medical evidence for the purpose of discounting each factor which weighed in favor of finding Mr. Lathrop's pain complaints limited his functional abilities.  AR14-19.  This, Mr. Lathrop argues, results in the practical effect of really only considering the

---

[19] This is incorrect.  See AR420-45.

[20] The ALJ also stated Mr. Lathrop had not undergone "intramuscular injections" but this is clearly incorrect, as the record documents –and the ALJ noted in the preceding paragraph of its decision—that Mr. Lathrop had undergone repeated epidural steroid injections and trigger point injections. AR17.

objective medial evidence when determining whether his subjective symptoms limited his ability to work in violation of 20 C.F.R. § 404.1529, SSR 6-3p, and Polaski.

Mr. Lathrop also asserts the ALJ's failure to properly weigh the other factors enumerated in 20 C.F.R. § 404.1529 and SSR 16-3p was influenced by its misstep earlier in the analysis to recognize myofascial pain syndrome as a medically determinable impairment. This failure, Mr. Lathrop asserts, caused the ALJ to erroneously become unnecessarily fixated on the lack of objective medical evidence to support his thoracic spine pain. Consequently, the ALJ mistakenly disregarded Mr. Lathrop's thoracic pain complaints and associated functional limitations when formulating the RFC. This is so even though the ALJ conceded none of the experts indicated Mr. Lathrop was "faking" or malingering. The court agrees with Mr. Lathrop.

When discussing Mr. Lathrop's thoracic spine tenderness and spasming, along with complaints of ongoing thoracic spine pain to his treating surgeon (Dr. Adams), the ALJ stated "the lack of objective evidence to substantiate the claimant's complaints is noted repeatedly in this record." AR15 (citing Dr. Adams' note indicating he was not sure of the source of Mr. Lathrop's pain). Dr. Adams stated in his written statement and deposition, however, that he believed cervicalgia was the source of Mr. Lathrop's ongoing thoracic pain. AR339, 521.

The ALJ then cited Dr. Espiritu's record (AR16) in which Dr. Espiritu indicated Mr. Lathrop's complaints seemed out of proportion for people who

have had the same type of surgery. The ALJ cited this record for the proposition that there was no objective medical evidence to support Mr. Lathrop's thoracic pain complaints, but the ALJ omitted that portion of Dr. Espiritu's statement in which Dr. Espiritu opined Mr. Lathrop suffered from myofascial pain syndrome. AR 629. That opinion was later confirmed by both Dr. Johnson and Dr. Peterson. AR 640, 321. Furthermore, the FCE performed by Craig Riley, PT, using the Blankenship method, confirmed that Mr. Lathrop gave a valid effort and that he had extreme limitations upon the use of his upper extremities. AR605, 607. The results of this FCE were endorsed by Mr. Lathrop's pain management physician, Dr. Peterson. AR321.

The ALJ rejected the FCE, however, because it noted "multiple medical doctors have noted there is a lack of objective evidence to support such limitations." AR18. As explained by the Eighth Circuit in Baker, however, the valid FCE *itself* constitutes objective evidence, and is proper medical evidence when endorsed by the claimant's physician. Baker, 457 F.3d at 892, n.6.

The ALJ's summary sentence is telling. AR20. The ALJ stated, "in sum, the above residual functional capacity assessment is supported by the entire record, but largely by the limited objective findings and by the claimant's modest treatment." Id. In this instance, though the ALJ discussed the other factors enumerated in 20 C.F.R. § 404.1529 and Polaski, it gave improper weight to the objective medical evidence. On remand the other factors should be properly considered.

87

**F.    Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Mr. Lathrop requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider his case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly

supports such a finding." <u>Buckner</u>, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. <u>Id.</u>; <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. <u>See also Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

DATED January 7, 2019.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge